**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Frank Joseph CARACCI, Defendant-Appellant.**

**No. 29832.**

United States Court of Appeals, Fifth Circuit.

June 2, 1971.

Rehearing Denied June 25, 1971.

Louis A. DiRosa, Guy Johnson, A. R. Occhipinti, New Orleans, La., for defendant-appellant.

Gerald J. Gallinghouse, U. S. Atty., Julian R. Murray, Jr., First Asst. U. S. Atty., New Orleans, K. Eric Gisleson, Atty., Dept of Justice, New Orleans, La., for plaintiff-appellee.

Before CLARK, Associate Justice,* and GEWIN and RONEY, Circuit Judges.

GEWIN, Circuit Judge:

Appellant Frank Caracci was indicted in New Orleans with two other alleged conspirators on three counts charging conspiracy[1] to bribe and bribery of a

---

* Associate Justice of the United States Supreme Court (Ret.), sitting by designation.

1. A conspiracy was charged within the meaning of 18 U.S.C. § 371 which proscribes a conspiracy to commit any offense against or to defraud the United States or any agency thereof.

public official in violation of 18 U.S.C. §§ 2,201(b), 201(f). One of the accused, John Q. Adams, pled guilty, and the other, Robert Vaucresson, was granted a severance. Appellant Caracci was found guilty on all counts after a jury trial. He was sentenced to one year in prison and fined $10,000. We affirm.

In 1968 Internal Revenue Service Agent A. J. Moline began a routine audit of Caracci's income tax returns for the years 1965, 1966 and 1967. On February 7, 1969, Agent Moline's stockbroker, John Q. Adams, made overtures which led him to believe that he would be offered a bribe to settle the tax affairs of Caracci through other than legal means. Agent Moline promptly contacted his Regional Inspector to report the overtures and to ask further instructions. A special inspector was dispatched to New Orleans to supervise further investigative activities. Agent Moline was carefully instructed to "play along" with whatever suggestions might be made, but under no circumstances was he to initiate conversations with anyone on the bribery subject. There is ample evidence in the record to indicate that Moline carefully followed these instructions.

In order to arrange a meeting with Caracci and to discuss the terms of the proposed illegal agreement, there ensued a large number of meetings and telephone calls between Adams and Agent Moline. In the course of these activities, Agent Moline conversed with a third conspirator, Robert Vaucresson, whose function it was to act as a liaison between Adams and Caracci. Almost all of these conversations were recorded by Internal Revenue Agents through the use of an electronic device concealed on the person of Agent Moline and a telephone "bug." [2]

On March 3, 1969, Agent Moline, equipped with a concealed transmitter, finally met with Caracci at Caracci's place of business, the "500 Club" in New Orleans. Because Caracci was wary of eavesdropping, all negotiations concerning the bribery were conducted by passing written notes back and forth; the notes were burned at the end of the meeting. It was agreed that Moline would be paid $7500 as follows: $2500 in one week and $5000 after Caracci received a "No Change Letter" from the IRS indicating that his tax returns had been cleared. These sums together with an additional $1000 for division between Adams and Vaucresson were delivered as agreed at further meetings between Caracci and Agent Moline on March 10 and April 9. Notes were again passed at the March 10 meeting and burned at its conclusion. Caracci was arrested on April 14, 1969.

Appellant first argues that Katz v. United States [3] should be read as implicitly overruling On Lee v. United States [4] to condemn on Fourth Amendment grounds the use of evidence obtained as a result of his conversations with a "bugged" agent. Any doubt concerning the lack of merit of this claim has been squarely resolved by the Supreme Court in United States v. White.[5] Quoting from *On Lee* the Court concluded:

" 'It would be a dubious service to the genuine liberties protected by the Fourth Amendment to make them bedfellows with spurious liberties improvised by farfetched analogies which would liken eavesdropping on a conversation, with the connivance of one of the parties, to an unreasonable search or seizure. We find no violation of the Fourth Amendment here.'

---

2. These tapes were not used at trial by the prosecution. Agent Moline gave all of his testimony from memory.

3. 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

4. 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952).

5. 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 [1971]. At oral argument, on February 4, 1971, it was agreed that the Supreme Court's decision in *White* might be dispositive of the Fourth Amendment issue presented. Accordingly, final decision in this case was postponed until after that decision was handed down.

343 U.S., at 753–754, 72 S.Ct., at 972. We see no indication in *Katz* that the Court meant to disturb that understanding of the Fourth Amendment or to disturb the result reached in the *On Lee* case, nor are we now inclined to overturn this view of the Fourth Amendment.

"Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter's Fourth Amendment rights. Hoffa v. United States, 385 U.S. 293, 300–303, 87 S.Ct. 408, 412–414, 17 L.Ed.2d 374. For constitutional purposes, no different result is required if the agent instead of immediately reporting and transcribing his conversations with defendant, either (1) simultaneously records them with electronic equipment which he is carrying on his person, Lopez v. United States, *supra* [373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462]; (2) or carries radio equipment which simultaneously transmits the conversations either to recording equipment located elsewhere or to other agents monitoring the transmitting frequency. On Lee v. United States, *supra*.

\*　\*　\*　\*　\*　\*

"It is thus untenable to consider the activities and reports of a police agent himself, though acting without a warrant, to be a 'reasonable' investigative effort and lawful under the Fourth Amendment but to view the same agent with a recorder or transmitter as conducting an 'unreasonable' and unconstitutional search and seizure." [6]

■ Appellant's second contention strikes at the court's treatment of al-legedly prejudicial public statements and press releases. On February 16, 1970, the first day of trial, the prosecutor, Assistant U. S. Attorney Julian Murray, and his immediate supervisor, U. S. Attorney Gerald Gallinghouse appeared on a taped television interview seen locally in New Orleans. In it they allegedly acknowledged the threat of "Organized Crime" in the community and promised vigorous enforcement of the laws. On the following day, appellants moved for a mistrial and asked for a court order prohibiting further such utterances. Both requests were correctly denied, the court having in no way abused the discretion accorded it in Gordon v. United States.[7] The remarks themselves were strictly of a general nature. Appellant makes no contention that he or any of his co-defendants were named or in any way alluded to; nor does he complain of even an indirect reference to his trial. Moreover, he has not convinced us that any part of the prosecution's case improperly connected him with the statement by further reference to the problem of "Organized Crime." Additionally even if the remarks could be remotely construed as prejudicial, appellant has given us no reason to believe that any member of the jury disregarded the court's clear and unequivocal instructions to avoid exposure to news releases or other publicity related to the trial.

■ Appellant next complains that he was impeded in proper preparation for the trial because the prosecution deliberately and unfairly "suppressed, withheld, expunged, and edited evidence" necessary to the appellant's defense. These contentions are groundless. The record shows that the prosecution was scrupulously fair in affording appellant more than ample access to all evidence to which he was entitled and in fact disclosed appreciably more than is required by law.[8]

6. Ibid. at 750, 91 S.Ct. at 1125 (footnote omitted). Cf. United States v. Hernandez, 441 F.2d 157 (5th Cir. 1971).

7. 438 F.2d 858, 872–873 (5th Cir. 1971).

8. See, e. g., 18 U.S.C. § 3500; Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Fed.R.Crim.P. 16(a).

■ Appellant's principal defense at trial was entrapment; he sought to show that Agent Moline initiated the crime by negotiating as if to arrive at a legitimate settlement of Caracci's tax deficiencies. Only after receipt of a "No Change Letter", Caracci argues, did he perceive his involvement in an illegal arrangement, and it was then too late to withdraw. Appellant asserts on his fourth point that the court's charge on the entrapment issue did not comport with Sorrells v. United States [9] and Sherman v. United States.[10] We cannot agree. The trial court's charge was synthesized almost verbatim from the opinions in *Sherman* and *Sorrells;* it is a full and fair charge, and its submission was entirely proper in these circumstances.[11] Appropriate excerpts from the charge are quoted in the margin.[12]

■ Appellant's fifth objection is that the trial court improperly informed his two trial counsel that they were not to offer repetitious arguments in summation and then interrupted the second attorney's argument on one occasion to say "we have already heard that, go on to something new." It is our opinion that the trial court was well within the bounds of his discretion in making this comment.[13]

9. 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932).

10. 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).

11. See United States v. Mann, 432 F.2d 53 (5th Cir. 1970); Goss v. United States, 376 F.2d 812 (5th Cir. 1967); Collier v. United States, 301 F.2d 786 (5th Cir. 1962).

12. I charge you that the plea of entrapment is a legal defense and if you find from the evidence that the United States through one of its agents is responsible for the defendant violating the law which he would not have otherwise violated, then I charge you that you are to find the defendant not guilty. Now in that respect you will consider all the facts, of course, and circumstances surrounding this case and the law on the question of entrapment which I am now about to give you.

Now, the term entrapment signifies instigation of the crime by officers of government. Entrapment is the conception and planning of an offense by an officer and his procurement of its commission by one who would not have perpetrated it except for the trickery, persuasion, or fraud of the officer. The pertinent question is whether the defendant is a person otherwise innocent whom the government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials or agents. The fact that officers and employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution.

\* \* \* \* \*

When the criminal design originates not with the accused but is conceived in the mind of the government officer and the accused is, by persuasion, deceitful representation or inducement lured into the commission of the criminal act, the government is estopped by sound public policy from prosecution thereof. When a person has no previous intent or purpose to violate the law, but is induced or persuaded by law enforcement officers or their agents to commit a crime, he is a victim of entrapment and the law as a matter of policy forbids his conviction in such a case. So that the pertinent question is whether a defendant is a person otherwise innocent whom the government is seeking to punish for an alleged offense which is the product of the creative activities of its own officials, agent or agents.

The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime. Criminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer. However, a different question is presented when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute. If you find that the officials of the government implanted in the mind of the defendant the disposition to commit the offense in question you are instructed to find the defendant not guilty.

13. See Hale v. United States, 410 F.2d 147, 152 (5th Cir. 1969); Davis v. United States, 409 F.2d 1095 (5th Cir. 1969).

Appellant's final contention, raised for the first time on appeal, is that the trial court exercised undue pressure on the jury to reach a verdict by allowing them to continue their deliberations until they reached a verdict at 10:00 p. m.  This contention is without merit.  The length of time of jury deliberation is a matter of discretion of the trial judge; without more, it cannot constitute coercion.[14]  The record fails to indicate any such coercion.  Indeed, about thirty minutes before the verdict was returned, the court instructed the jury that they need not show reticence in requesting additional time to deliberate.

Our review of the record and all of appellant's contentions convince us that no prejudicial error was committed during his trial.

Judgment affirmed.

14.  DeVault v. United States, 338 F.2d 179 (10th Cir. 1964) ; Kowalsky v. United States, 290 F.2d 161 (5th Cir. 1961) cert. denied 368 U.S. 875, 82 S.Ct. 120, 7 L.Ed.2d 76; cf. Burroughs v. United States, 365 F.2d 431 (10th Cir. 1966).