**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Robert QUINTANA, Defendant-Appellant.**

**No. 71–1585.**

United States Court of Appeals,
Tenth Circuit.

March 31, 1972.

Rehearing Denied May 16, 1972.

Richard J. Spelts, Asst. U. S. Atty. (James L. Treece, U. S. Atty., and Milton C. Branch, Asst. U. S. Atty., on the brief), for plaintiff-appellee.

Jay L. Gueck, Denver, Colo., for defendant-appellant.

Before HILL, BARRETT and DOYLE, Circuit Judges.

---

WILLIAM E. DOYLE, Circuit Judge.

This appeal is from a jury verdict finding defendant-appellant Robert Quintana guilty of using extortionate means to collect an extention of credit, in violation of 18 U.S.C. § 894. A judgment of acquittal was entered in behalf of codefendant Edward Quintana for insufficiency of the evidence against him.[1] The challenge on this appeal is to the sufficiency of the evidence supporting the jury's verdict against Robert Quintana; secondly, the court's ruling admitting tape recordings of telephone conversations between appellant and Wright, the alleged victim of the extortion; thirdly, the court's refusal to grant to the defendant-appellant discovery of Grand Jury minutes and testimony of witnesses who appeared before the Grand Jury. We have reviewed the contentions and we conclude that they are lacking in merit, whereby we affirm the conviction.

The statute under which appellant was convicted prohibits knowing participation in the use of extortionate means to attempt the collection of a debt.[2] "Extortionate means" is defined as:

. . . [A]ny means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person. 18 U.S.C. § 891(7).

The evidence against appellant consisted primarily of the testimony of Ronald Wright, a tape recording which contained eight telephone conversations between Wright and appellant, and Wright's testimony regarding another conversation between him and a person he thought was Edward Quintana. The tape was played to the jury with certain portions deleted as a result of an order by the court.

In the summer of 1970 Wright borrowed from Robert Quintana, in two loans, the sum of $500.00. The rate of interest was $5.00 per $100.00 per week, or a total of $25.00 per week. There was not any specified date or time period for payment of the principal. Interest payments were the important part of the transaction. The loans had been arranged by Wright's employer, Jimmy Clapes, who was personally acquainted with Robert Quintana.

For the first month and a half, from July until mid-August, the interest payments were deducted by the employer from Wright's car allowance and paid directly to Robert Quintana. After Wright terminated this employment in mid-August, interest payments were

---

1. This judgment resulted from inability of the witness to identify his voice on the phone.

2. 18 U.S.C. § 894 provides in pertinent part:

    (a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

    (1) to collect or attempt to collect any extension of credit, or

    (2) to punish any person for the nonrepayment thereof,

    shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

    \* \* \* \* \*

made directly to Robert Quintana at the latter's home until the first week in October of 1970. He testified to paying some "six or seven hundred dollars." This amount did not, of course, include any payments on the principal.

The interest payments were not always delivered on time or in the full amount, and Wright testified to receiving telephone calls from Quintana reminding him of the accumulated obligation. In at least one of these calls, Robert Quintana advised Wright to become current because "I don't want to send somebody around to collect it." The same message was repeated in early October just after Wright ceased to make payments. Soon thereafter, Robert Quintana called again to say that he would be out of town and that his brother Edward Quintana would be in touch with him regarding the loans.

Following this last communication Wright called the office of the Denver District Attorney (State) and reported what had happened. After conferring with officers of the Organized Crime Unit, Wright agreed to have a tape recorder attached to his telephone at home.

There were transcriptions of two conversations, October 31 and November 6, between Wright and Robert's brother. The court rejected these, but at the same time allowed Wright to testify, and he did so without objection. The reason for rejection of the transcripts was the fact that the tapes had become erased, and the transcripts were ruled out by the trial court on the ground that they were not the best evidence. At the same time, the court allowed Wright to testify as to the conversation had on November 6. Previously, on October 31, a person thought to be Edward Quintana had called up and said "This is Robert's brother" and had told him to drop some money off at Robert's house. The same voice was identified by Wright as the one who called on November 6. Wright testified that on this latter occasion the caller made a threat of violence.[3]

From November 21, 1970, to January 11, 1971 Robert Quintana made eight phone calls which were admitted into evidence and played to the jury. Quotations from one of these conversations is shown so as to indicate their substance and tone.[4]

---

3. According to Wright this conversation was direct and to the point:
   "THE WITNESS: He said, 'What do I have to do, come by your house over on 33d or 32d or wherever it is and beat your fucking head in?' I believe that's what he said, to my knowledge."

4. &ast; &ast; &ast; &ast; &ast;
   "Q. Well, Ron, I'm gonna have to have some—uh—or else *they* told me to go up there and talk to ya and try to get somethin', and try to get that money in. *They just can't stand it no more, Ron.* Two months, I mean, you didn't even try to make ten dollars, fifteen dollars, anything, you know.
   W. Well, I just don't have it. You know, I paid back an awful lot, Robert."
   &ast; &ast; &ast; &ast; &ast;
   Look, Ron, I don't even give a damn if you even pay the vigorish (interest). Just get the money in here cause that's what I want, that's what *they're mad about.*
   W. Who's made atcha?

   Q. The guys I got it from—Mertz and them—they ain't gonna stand for that shit—uh—Ron.
   W. I don't even know those guys.
   Q. (Inaudible) *well, I'll tell you why —you don't wanna know Mertz. And then if Mike gets on ya,* that's another one.
   W. Oh, that's your brother.
   Q. Yeath. So is Mertz my brother, you know that."
   &ast; &ast; &ast; &ast; &ast;
   "Q. Well, Ron, I, I, I just can't just keep tellin' those guys this. *Now one of them I know is gonna want to go up there tonight.*
   W. Well, if he comes up I don't know what good it's gonna do him.
   Q. Well, Ron, you better think twice, I'm tellin' ya. *I mean I'm just tellin' ya for your own good.* You know you can't screw these guys around like that, you know that. They didn't ask you to take their money, you called and took their money. And when you do that, Ron, you're responsible to pay it back. You knew what you was in for.

The reference to "these guys" and the undertone as to what they might do pervades the entire transcript of the telephone calls.[5] There was, in addition, testimony relating to a December 12 meeting at Azar's Restaurant between Wright and Robert Quintana. Wright said that he asked appellant "what would happen if I didn't pay." Quintana was said to have responded that "We would work you over and every time we saw you we would work you over." Wright was wearing a body microphone, and this conversation was transmitted to investigators stationed outside the restaurant, but a recording made of it was not introduced into evidence, apparently due to the fact that large portions had been garbled and were indistinct.

## I.

■ In challenging the sufficiency of the evidence to support the verdict, appellant argues that he did not threaten physical violence; that on the contrary he sought to convince Wright by friendly persuasion to make his payments so as to protect him from violence at the hands of others. He, in effect then, says that the means he used to collect the debt were legitimate and that he was not therefore guilty of using any extortionate means. The evidence heretofore summarized does show, with one exception

(the conversation at Azar's which was not recorded, but which was related by Wright), persuasion of a sort. However, the persuasion is transparent and the threat of dire violent consequences flowing from Wright's failure to pay is present, and, as noted, toward the end there was no effort to veil the threat. Moreover, there were the threats of Robert's brother, who was commissioned by defendant to enforce the payments for an interim period, and this particular incident left nothing to the imagination. The general nature of the total transaction was such as to render this threat a clear incident of the general operation and, thus, to be within the scope of the authority granted. Hence the defendant was accountable for this statement of his agent.[6]

■ In summary then the total record fully supports the allegation that extortionate means were used in an attempt to collect an extension of credit. We are mindful, of course, that the background circumstances, namely the extremely high interest rate, plus the never ending payments, support fully this conclusion.

## II.

■ Appellant urges us to find that the tape recordings were made in violation of the Fourth Amendment and thus

---

W. What do you—what do you suggest I do?

Q. Well, Ron, at least *give 'em somethin' so you can keep 'em quiet, don't you understand what I'm tryin' to tell ya?*

Telephone call between Ronald Wright and Robert Quintana of December 12, 1970 (emphasis added).

5. For example, the following excerpt from the January 11, 1971 conversation where Quintana invokes the name of Jimmy Clapes, Wright's former employer:

"Q Well—Ron, now look, I told you now long time, it's over a month and a half ago—I said you've gotta make some kind of arrangement, I don't care what it is, you gotta make it. And now you just ignore it, Ron. Then there's nothin' else I can do, I can't keep these guys on my back. So I— there's only one alternative, and that's

to go after Jimmy. Now, if that don't work there's gonna hafta be somethin' done."

6. See 22 C.J.S. Criminal Law § 84 at 246, Commission of Crime by Agent, wherein it is said at pages 247–248:

A principal may, however, be liable for the criminal act of his agent under certain circumstances, as where the principal, with the requisite criminal intent, actually procures, hires, incites, encourages, authorizes, or directs another to commit such criminal act or consents to the commission of the act by an agent . . . .

See also United States v. Food and Grocery Bureau of So. Cal., 43 F.Supp. 966, 971 (U.S.D.C., S-D-Cal.1942). Cf. Empire Printing Company v. Roden, 247 F.2d 8, 17, 17 Alaska 209 (9th Cir. 1957). See also IV Wigmore on Evidence § 1078 at 126.

were inadmissible. The issue, of course, is whether a telephone tap constitutes an unreasonable search and seizure and thus violates the Fourth Amendment when one party consents but the other party has no knowledge of the phone tap and thus believes that the conversation is private.

In Holt v. United States, 404 F.2d 914, 919 (10th Cir. 1968) this court interpreted the Supreme Court's decision in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1968), as not applying when an informant has consented to the eavesdropping. United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) supports this evaluation of *Katz*. Also, the more recent rulings by other circuits reflect the same viewpoint. See, e. g., United States v. Puchi, 441 F.2d 697 (9th Cir. 1971); United States v. Skillman, 442 F.2d 542 (8th Cir. 1971); United States v. Caracci, 446 F.2d 173 (5th Cir. 1971). And it makes no difference which party initiated the call. See United States v. Puchi, *supra*. We do not distinguish between calls initiated by Quintana and those commenced by Wright. The decisions in *White* and *Holt* do not call for this. The significant factor is that of the consenting party; hence a search warrant was not necessary. The tape recordings were admissible, as well as the agents' recollections of the conversations they overheard.

### III.

The trial court denied a motion for pretrial discovery of the Grand Jury proceedings, including the minutes and the testimony of government witnesses. Appellant had no right to view these materials before trial, 18 U.S.C. § 3500 (1970), and, indeed, the transcript of Wright's testimony before the Grand Jury was furnished to appellant's counsel at the noon recess before the completion of direct examination. The tape recordings of the phone calls were made available to appellant's counsel before trial. Finally, the material sought to be discovered with regard to the Grand Jury proceedings was not testimony of the defendant which is discoverable under Federal Rule of Criminal Procedure 16. Prior to the 1970 amendment to 18 U.S.C. § 3500, the decision whether to disclose Grand Jury testimony was committed to the sound discretion of the trial court on the showing of a particularized need. Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1965); Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959); United States v. Fuentes, 432 F.2d 405, 408 (5th Cir. 1970). No abuse is apparent here even applying this standard.

The judgment is affirmed.