**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Joseph BRIOLA, Defendant-Appellant.**

**Nos. 71–1615, 72–1246.**

United States Court of Appeals,
Tenth Circuit.

Sept. 7, 1972.

Rehearing Denied Sept. 27, 1972.

---

James L. Treece, U. S. Atty., and Richard J. Spelts, Asst. U. S. Atty., for plaintiff-appellee.

John J. Flynn and Michael D. Kimerer of Flynn, Kimerer, Thinnes & Galbraith, Phoenix, Ariz., for defendant-appellant.

Before LEWIS, Chief Judge, and KILKENNY * and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

In this case the defendant-appellant, Joseph Briola, was charged with having knowingly and wilfully used extortionate means, contrary to § 891(7) of Title 18, United States Code,[1] in attempting to

---

* Of the Ninth Circuit sitting by designation.

1. Which provides as follows:
 (7) An extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person.

collect from one Donald Meyer, an extension of credit. The indictment further charged that the defendant, together with one James R. Clapes, who was not named as a defendant, caused harm to the person of said Donald Meyer, in violation of Title 18 U.S.C. § 894.[2]

Appellant Briola challenges the sufficiency of the evidence to establish that there existed an extension of credit within the meaning of the statute. He here contends that in the dearth of such evidence even the use of force does not fulfill the statutory requirements.[3] Our inquiry will then be addressed mainly to this element, namely, adequacy of the evidence in support of the allegation that the defendant was engaged in attempting to collect an extension of credit.

In the fall of 1970 the defendant, together with one James R. Clapes and Anthony Ligrani, were engaged in a bookmaking operation. Defendant-appellant owned 50 percent of the enterprise and Clapes and Ligrani 25 percent each. In October 1970, Donald Meyer was hired by the partnership to work as phone man. His duty was to receive bets from customers over the phone and to relay this information to the partners. The evidence showed that Meyer had some of his own customers for whom he would pay and collect money as well as relay information to Briola, but as to most of his contacts he would merely receive the bets and relay the information. All of these bets were handled on a credit basis.

In November Meyer placed a series of bets on his own account and lost $900.00. He had placed these bets in the name of Wynn Don, who was said to have been a real person and an acquaintance of Meyer at Park Hill Golf Club. According to Meyer he had taken a bet from him on one occasion. Following this November incident, Meyer advised Briola and Clapes that he had personally made the bets that were charged to Wynn Don. He was told by Briola that "everybody can made a mistake but don't make any more." Thereafter, Meyer repaid this loss to the partnership.

He did not repeat this practice until the New Year's football games of January 1, 1971, but here again he used the name of Wynn Don in placing a number of bets. He lost approximately $10,000.00. Soon after the games Briola called Meyer to discuss the Wynn Don loss. Being uncertain as to what to do about this, Meyer called Clapes and told him that Wynn Don had left town and would not pay. Clapes in turn advised Briola, and thereafter the three partners set up a meeting at Briola's apartment with Meyer. This meeting lasted about an hour and a half.

Clapes testified that before the meeting the thought passed his mind that Meyer had placed the bet on his own behalf, and he further testified that Meyer was asked if any of the bet was his. At first, Meyer maintained that the bettor was really Wynn Don and the discussion was as to how to locate him. Meyer testified on direct that he agreed to repay the money since he was responsible for

---

2. Subsection (a) thereof provides as follows:

 (a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means
 (1) to collect or attempt to collect any extension of credit, or
 (2) to punish any person for the nonrepayment thereof, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

3. Counsel for Briola argue:
 * * * Briola never knowingly extended credit to Donald Meyer. Meyer

misappropriated money from Briola by placing bets on his own behalf under the code name of "Don Wynn." To call this act an extension of credit would make § 894 an absurdity, since any employer who harms an employee because he discovered the employee had been stealing from him, would be guilty of a violation of § 894. This is clearly not the statute's purpose. See Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971).

it. Thereafter, according to further testimony of Meyer, Briola grabbed him and slapped him several times. The upshot of it was that Meyer agreed to try to get the money from his mother and stepfather, and he was questioned closely as to their identity and financial abilities. After agreeing to get the money he said that Wynn Don would return to town later and he could get reimbursed from him. At that point Clapes administered a second beating. The sum total result was that Meyer was severely beaten as evidenced by black eyes, loose teeth and other outward indications. He also said that he was kneed in the groin. Arrangements were made for payment of the money the next day.

Defendant contends, as indicated above, that if anything the witness Meyer was being punished for stealing from his employer and that this particular incident was not within the proper scope of the statute in question since there was not the kind of extension of credit that was there contemplated.

■ It is undoubtedly true that this statute was primarily aimed at what is commonly called loansharking, but it is not limited in its terms to a loan in the sense of money passing. See Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971). From our reading of *Perez* we are convinced that the real thrust of the legislation is directed to the use of extortionate means in order to collect monies which the creditors maintain are owing to them, regardless of whether the loan arose from a traditional type of loan or resulted from the assumption of responsibility as a result of force or threats. The relationship of the use of extortionate means of collecting extension of credit to bookmaking and similar activities was specifically noted in *Perez*. The indebtedness which is now before us is within the Act's ambit.

■ The term "to extend credit" is broadly defined by the statute (18 U.S. C. § 891(1)) as follows:

(1) To extend credit means to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred.

Thus, the definition embraces a debt which has come into being under circumstances like the instant ones.

Subsection (3) provides:

(3) The term "debtor", with reference to any given extension of credit, refers to any person to whom that extension of credit is made, or to any person who guarantees the repayment of that extension of credit, or in any manner undertakes to indemnify the creditor against loss resulting from the failure of any person to whom that extension of credit is made to repay the same.

■ In the case at bar there is no insufficiency of evidence in the record to establish that the witness Meyer accepted responsibility for the payment of the debt prior to or contemporaneously with the use of force to collect it. The record also shows that Meyer was indeed the debtor from the inception of the debt and that Wynn Don was fictitious in this transaction at least, and hence the jury could very well have believed that the partners knew this from the previous incident. Also, since Wynn Don was Meyer's customer he was responsible for payment of the loss. Thus, there existed a basic debt involving an extension of credit within the meaning of the statute.

■ The defendant-appellant seeks to avoid responsibility by questioning the time sequence of the creation of the debt and the beating. He would have criminal responsibility turn on whether the beating was administered immediately before or immediately after the creation of the promise to pay. This analysis must fail, first, because the evidence, as previously noted, is sufficient to support

a finding that the debt arose prior to the first beating. Apart from that, we are impressed that the series of events constituted a single transaction within which the acknowledgment of the debt and the extortionate means were substantially contemporaneous. That, to our way of thinking, is sufficient. As noted, the essence of the offense is the use of force or threats for the purpose of extorting money. If the crime is made to turn on specific sequence, it introduces an artificial standard which robs the definition of the offense of its substantiality. The meeting in question was for the purpose of collecting the $10,000.00 and there were no noticeable formalities. Certainly, the defendant and Clapes were not concerned with having a legally enforceable contract.

■ Finally, the evidence is sufficient to establish that Clapes and Briola were partners. Consequently, Briola cannot escape responsibility for the beating which was inflicted by his partner Clapes in his presence since he was shown to have been standing by lending support to the activity of Clapes. Compare United States v. Quintana, 10 Cir., 457 F.2d 874 (1972). See also United States v. Keresty, 334 F.Supp. 461 (W.D. Pa.1971).

The final point urged by Briola is alleged error arising from the refusal of the court to grant a new trial as a result of the efforts of Meyer to recant or relent his trial testimony. A conclusory affidavit of Meyer was attached to Briola's motion for a new trial in which Meyer stated that he had testified falsely at the trial.

■ We recognize that a new trial should be granted where the court is convinced that a witness has committed perjury at the trial. In this case, however, the trial court, after hearing all of the evidence, including that of the defense attorneys at trial of Briola, found that both the affidavit and the testimony on motion for new trial were false. The court also noted that elements of the so-called Larrison rule derived from Larrison v. United States, 24 F.2d 82,

87–88 (7th Cir. 1928) were not satisfied. It is not contended, and indeed it could not be, that the trial court failed to carefully consider Meyer's subsequent testimony, both written and oral. We do not have the slightest doubt as to the accuracy of the trial's court's evaluation.

Finding no error in the case, the judgment is affirmed.

KILKENNY, Circuit Judge (dissenting):

The indictment charges appellant with collecting an extension of credit by extortionate means in violation of 18 U.S.C. §§ 891(7) and 894.

On the record before us, there could be an extension of credit to Meyer under two theories and two theories only: (1) that appellant knew that Meyer was placing bets under the name of "Wynn Don", or (2) that Meyer personally assumed the debt, after the alleged assault, by offering to obtain the money from his parents.

(1) It is clear that "Wynn Don" was an actual person who had placed at least one bet under his own name. The name seemed to attract Meyer and in November he used it for his personal betting and after losing a substantial sum, admitted his wrongdoing to appellant and Clapes, then agreed to pay the losses and did so. The name "Wynn Don" did not again appear until a few days immediately before the meeting on January 2nd.

There is nothing in the record to support a finding that appellant, or, for that matter, his partner, Clapes, knew that Meyer had been placing bets, after the November occurrence, under the name "Wynn Don". For that matter, the proof demonstrates that appellant and his partner believed Meyers when he told them that "Wynn" had *actually placed the bets and had left town*. Obviously, appellant and his partners were angry at Meyer, not for using the name "Wynn" instead of his own, a fact of which they had no knowledge, but for permitting "Wynn" to make the bet and then leave town. What occurred at the

crucial meeting speaks for itself. If appellant and his partners had known that Meyer was again using the name "Wynn Don", they would have confronted him with this fact and would not have been urgently inquiring as to the then whereabouts of the missing person. Beyond that, the record is quite clear that appellant, when he left the January 2nd meeting, was totally unaware of the fact that Meyer had again used the fictitious name. In agreeing to be responsible for the loss, Meyer was trying to keep appellant and his partners from learning of the fact that he had again made bets under the Wynn name. Simply stated, the record is devoid of proof that appellant, or his partners, knew that Meyer had again been betting under the name "Wynn Don". The fact that Clapes may at one time have *"thought"* that "Wynn Don" and Meyer were *possibly* the same person does not rise to the dignity of proof against the appellant.

(2) Assuming, *arguendo*, that Meyer's statement that he would assume the debt and obtain the money from his parents amounts to an extension of credit as charged in the indictment, there is absolutely no evidence that appellant assaulted or, in any manner, abused Meyer after the assumption of the indebtedness. For that matter, the record would support a finding that appellant was protecting, rather than abusing Meyer.[1]

In United States v. Quintana, 457 F. 2d 874 (CA 10 1972), the extension of credit was undisputed. Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), does not support a conviction on our facts.

In my view, the statutes in question were never intended to apply to a factual background such as that before us.

I would reverse and direct a dismissal of the indictment.

---

1. "Q And he [Clapes] grabbed him [Meyer], pulled him out of the chair?
 A Yes, when he grabbed him it looked like James Clapes went back—I can't remember if Mr. Meyer hit him, pushed him or what the deal was, but then he started to hit him and then he grabbed him; they rolled to the floor, and he was trying to hit him on the floor *when Mr. Briola went over and broke up the fight."* [Witness, Ligrana, T. pp. 116–117]. [Emphasis supplied.]