UNITED STATES of America,
Plaintiff-Appellee,

v.

Frank Lewis JACKSON, Defendant-Appellant (two cases).

UNITED STATES of America,
Plaintiff-Appellee,

v.

John Brett ALLEN, Defendant-Appellant.

Nos. 77–1721, 77–1857 and 77–1856.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted April 19, 1978.

Decided June 19, 1978.

Rehearing Denied July 31, 1978.

Joseph Saint-Veltri, Denver, Colo. (Davies & Saint-Veltri), Denver, Colo., for appellant Allen.

Robert S. Berger, Denver, Colo. (Davies & Saint-Veltri), Denver, Colo., for appellant Jackson.

Joseph F. Dolan, U. S. Atty., Rod W. Snow, and William C. Danks, Asst. U. S. Attys., Denver, Colo., for appellee.

Before BARRETT, DOYLE, and LOGAN, Circuit Judges.

BARRETT, Circuit Judge.

In these consolidated appeals the appellants, Frank Lewis Jackson (Jackson) and John Brett Allen (Allen), seek reversal of the district court's order denying their motions for a new trial. The motions were based on the claim that new evidence has been discovered which either creates a reasonable doubt as to their guilt or which might have caused the jury to reach a judgment of acquittal had the evidence been available during trial.

Jackson and Allen were convicted by a jury of a conspiracy to import marijuana in violation of 21 U.S.C. § 952(a). They were tried with co-conspirators Gregory Keith Weiss and Ivan Lustig, who were also found guilty. Each of the co-conspirators appealed. This court affirmed the convictions of each. *See, United States of America v. Ivan Lustig and Gregory Keith Weiss*, Unpublished Nos. 75–1740 and 75–1741 (10th Cir. March 22, 1977); *United States of America v. John Brett Allen and Frank Lewis Jackson*, Unpublished Nos. 75–1738 and 75–1739 (10th Cir. April 21, 1977), cert. denied, 434 U.S. 856, 98 S.Ct. 176, 54 L.Ed.2d 127, October 3, 1977.

The government's case against the co-conspirators was developed primarily around the testimony of one Michael John Venus (Venus), an unindicted co-conspirator who was afforded immunity from prosecution. It is uncontested that Venus was the only witness directly identifying the defendants. However, some 24 other government witnesses testified in corroboration of many of the details related by Venus. The following is a summary of the testimony elicited from Venus at the trial, as set forth in the aforesaid opinion Nos. 75–1740 and 75–1741:

"Jackson was the first to approach him and suggest the possibility of Venus' flying into Mexico; Jackson brought Venus to Denver at which time Venus met with Allen, Jackson, Lustig and Weiss and discussed his employment as their pilot for

the purpose of flying marijuana out of Mexico; Venus was to be paid $5,000.00 per trip; after receiving money from Allen, Venus rented an airplane; prior to departing from Mexico, Allen, Weiss and Lustig took some of the seats out of the airplane; Weiss accompanied Venus on their first trip to Mexico where they picked up 800 pounds of marijuana in small bundles; Weiss paid for the marijuana with $12,000.00 in cash he had previously received from Allen; Allen met with them upon their return to Colorado and the marijuana was loaded into his truck; after unloading the marijuana from the airplane they flew to Boulder where they were met by Lustig; Allen, Jackson, Weiss and Lustig thereafter departed with the marijuana to weigh it and then sell it in Aspen; prior to his second flight to Mexico, Allen gave Venus $12,000 in cash to pay for the marijuana; Venus was to pick up Weiss en route but he was detained by bad weather; after picking up the second load of marijuana and while en route to Colorado, Venus was forced to land in a river bed; prior to landing in the river bed he kicked some of the marijuana sacks out of the airplane; after landing, Venus called Lustig and related his location and reported that he was out of gas; thereafter Allen arrived on the scene and Venus and Allen transferred the marijuana to a truck; and that subsequent to the flights to Mexico, he (Venus) was approached and questioned by Drug Enforcement Administration (DEA) officials at which time he decided it would be best to cooperate with them.

"Other Government witnesses corroborated Venus' testimony relative to: the use of the rented airplane; phone calls placed during the delays caused by bad weather on the second trip to Mexico; the forced landing in the river bed; the loading of the marijuana into the truck driven by Allen; the 'ditching' of several sacks of marijuana prior to the forced landing. A chemist for the DEA laboratory testified that the plant material which he analyzed and which was admitted in evidence was marijuana.

"None of the defendants testified. They called four witnesses who testified that Venus' reputation for truthfulness was bad and that he had a tendancy to drink in excess."

In opinion Nos. 75–1738 and 75–1739, *supra*, the following is a verbatim recital of the government's evidence relating to Jackson who, on appeal, challenged the sufficiency of the evidence to sustain his conviction:

"The Government established that: Jackson was the co-conspirator to approach Michael Venus (Venus) concerning the possibility of his employment as a pilot to fly from the United States into Mexico and return; Jackson brought Venus to Denver, Colorado, at which time he (Venus) met with Jackson and his co-conspirators and discussed in detail his flight to Mexico in order to bring marijuana from Mexico to the United States; after Venus returned with a planeload of marijuana, Jackson departed with his co-conspirators to weigh and sell the marijuana in Aspen, Colorado."

On June 13, 1977 the trial court conducted an evidentiary hearing on a motion for a new trial filed by Weiss. At the hearing, Venus recanted his prior testimony identifying Weiss as a party to the smuggling operation, stating that the Weiss who had been tried with Allen, Jackson and Lustig was not the same person with whom Venus had flown to Mexico. Venus also acknowledged that he had been paid $300 by DEA agents. Following the hearing, the trial court granted Weiss' motion for a new trial. The government subsequently dismissed the indictment against Weiss.

The crux of the contentions advanced by Allen and Jackson in this appeal is that Venus' recantation of his previous trial testimony implicating Weiss is such that even though it *does not* directly refute any of the incriminating testimony previously given by Venus implicating Jackson and Allen, *it does* reflect on the credibility of that testimony. Put another way, Jackson and Allen contend that in light of Venus' misidentifi-

cation of Weiss, and the fact that the chief witness had been paid by the government, it is likely that had this information been at hand, "the jury might have reached a different conclusion" in their trial. (Brief of Appellant Allen, p. 10; Brief of Appellant Jackson, p. 9.)

## I

We hold that the trial court did not error in denying the respective motions for a new trial. In each of the orders denying the motions, the court found and concluded that the testimony of Venus recanting his prior identification of Weiss ". . . does not affect the evidence against [Frank Lewis Jackson and John Brett Allen] and that the misidentification did not prejudice the trial as to defendant[s] [Jackson and Allen] and . . . there is no basis for a new trial. . . ." (Record, Vol. I, No. 77–1856, 77–1857, pp. 6–7; Record, Vol. I, No. 77–1721, p. 4.) We agree.

At the Weiss hearing Venus testified that prior to trial he (Venus) was shown a photograph of Weiss by a DEA agent and Weiss "looked very similar to the man I went to Mexico with" (Record, Vol. VII, p. 15), but that when he visited with Weiss in Arizona he (Venus) realized that ". . . the man I went to Mexico with had narrower shoulders and a smaller frame . . . he [Weiss] is obviously a bigger man than the guy I went to Mexico with" (Record, Vol. VII, p. 14); that although at trial he (Venus) did make a positive identification of Weiss as the party who went to Mexico with him, he (Venus) ". . . also pointed out the hair-color difference, and I believe I pointed out the fact that he seemed to be a larger man than the one I went to Mexico with" (Record, Vol. VII, p. 18); that he did not at any time discuss with any government official the possibility that his identification of Weiss was not certain prior to the trial; that after visiting with Weiss at his (Venus') apartment in Arizona about April 22, 1977, and speaking with Weiss for about 45 minutes, Venus realized that Weiss' voice was not the same as that of the man who flew to Mexico with him (Record,

Vol. VII, pp. 36–37); that the $300 he received from the DEA encouraged Venus "just to get it [the trial] over with" and that the money did not influence him to misidentify Weiss because "to be best of my knowledge at this time I identified the person in close proximity after they showed me a picture. The guy was very—looked very much like the man that went to Mexico with me, but what I am saying now is that he was not" (Vol. VII, pp. 41–42).

Jackson and Allen urge that this court remand their cases to the trial court for a new trial, or, in the alternative, that we direct the trial court to make and enter specific findings, reviewable in accordance with *Larrison v. United States,* 24 F.2d 82 (7th Cir. 1928). In *Larrison, supra,* the court held that a new trial should be granted where (1) the court is reasonably satisfied that the testimony given by a material witness is false, (2) that without it the jury might have reached a different conclusion, and (3) the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet or did not know of its falsity until after the trial. *Larrison, supra,* pp. 87–88. This rule has been loosely termed the "possibility" test, i. e., it requires only that the jury might have reached a different result if certain evidence had or had not been presented. Thus, the *Larrison* rule is most frequently used when recantation or perjury is involved. *United States v. Hiss,* 107 F.Supp. 128, 136 (S.D.N.Y.1952), affirmed 201 F.2d 372 (2nd Cir. 1952), *cert. denied,* 345 U.S. 942, 73 S.Ct. 830, 97 L.Ed. 1368 (1953).

Appellants contend that this court embraced the *Larrison* rule in *United States v. Briola,* 465 F.2d 1018 (10th Cir. 1972), *cert. denied,* 409 U.S. 1108, 93 S.Ct. 908, 34 L.Ed.2d 688 (1973), and that this ruling mandates a new trial. In *Briola,* unlike the case at bar, the party who testified at trial that he had been threatened with physical harm and subjected to extortionate means recanted his testimony, both by affidavit and testimony given during the course of an evidentiary hearing on the motion for a new trial, following the conviction of Briola. This court stated at page 1022:

"We recognize that a new trial should be granted where the court is convinced that a witness has committed perjury at the trial. In this case, however, the trial court, after hearing all of the evidence, including that of Briola, found that both the affidavit and the testimony on motion for new trial were false. The court also noted that the elements of the so-called Larrison rule derived from *Larrison v. United States,* 24 F.2d 82, 87–88 (7th Cir. 1928) were not satisfied. It is not contended, and indeed it could not be, that the trial court failed to carefully consider Meyer's subsequent testimony, both written and oral. We do not have the slightest doubt as to the accuracy of the trial court's evaluation."

■ We observe that this court in *Briola, supra,* did not necessarily adopt the *Larrison* rule. However, we did there observe that the trial court had noted and applied the rule and found that the elements were not satisfied.

■ The rule which this court has adopted and applied in relation to motions for new trial based on newly discovered evidence is the so-called *Berry* rule, derived from *Berry v. Georgia,* 10 Ga. 511 (1851). That rule, as adopted by this court in *United States v. Perea,* 458 F.2d 535 (10th Cir. 1972), is that newly discovered evidence must be more than " . . . impeaching or cumulative, must be material to the issues involved, and must be such as would probably produce an acquittal. *United States v. Gleeson,* 411 F.2d 1091, 1094 (10th Cir. 1969)." *See also: United States v. Allen,* 554 F.2d 398 (10th Cir. 1977), *cert. denied,* 434 U.S. 836, 98 S.Ct. 124, 54 L.Ed.2d 97; *United States v. Leyba,* 504 F.2d 441 (10th Cir. 1974); *Wion v. United States,* 337 F.2d 230 (10th Cir. 1974).

■ We recognize that the *Berry* rule is not generally applied to cases involving recantation or perjury. *United States v. Wallace,* 528 F.2d 863 (4th Cir. 1976); *United States v. Meyers,* 484 F.2d 113 (3rd Cir. 1973); *United States v. Curran,* 465 F.2d 260 (7th Cir. 1972); *United States v. Miller,* 411 F.2d 825 (2nd Cir. 1969). Nevertheless, we believe that the application of either the *Larrison* or *Berry* standards dictates affirmance of the trial court's order denying the motions for new trial in this case. *United States v. Mackin,* 183 U.S.App.D.C. 65, 561 F.2d 958 (1977), *cert. denied,* 434 U.S. 959, 98 S.Ct. 490, 54 L.Ed.2d 319; *In re United States,* 565 F.2d 173, 177, n.3 (1st Cir. 1977); *see also United States v. Stofsky,* 527 F.2d 237, 243–246 (2nd Cir. 1975), *cert. denied,* 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976). This is so because the trial court explicitly found that the recanting testimony of Venus relative to his prior misidentification of Weiss *did not* affect the evidence against Jackson and Allen.

In ordering a new trial for Weiss, the trial judge expressed concern not only for the claimed misidentification of Weiss, but also for the slim corroboration of Weiss' participation in the conspiracy. The only evidence to link Weiss to the rest of the group was a motel registration sheet which reflected that a person who registered as "Greg Wise" had spent several days at the Lamplighter Motel in Hobbs, New Mexico in August of 1974, that this person had made some long distance phone calls, including several to the Boulder phone in Lustig's apartment, and that this person was driving a U–Haul truck (Record, Vol. IV, pp. 279–284).

This was not the case as regards the rest of the group. A person named Frank Jackson purchased a Waco, Texas to Denver, Colorado airline ticket for Mick Venus (Record, Vol. IV, p. 212); Jackson, Venus and a John Edwards (Allen) registered and stayed at the Royal Inn in Boulder (Record, Vol. IV, p. 243); Lustig paid the utility bills on the Boulder apartment across from Venus (Record, Vol. IV, p. 274) and from which phone calls were made to (or charges accepted from) Trinidad, Colorado; Hobbs, New Mexico; Waco, Texas; and Hobbs to Chihuahua, Mexico (Record, Vol. IV, pp. 267–271).

In addition, it was verified that the airplane landed in a dry creek bed near Wiggins, Colorado (Record, Vol. IV, p. 289);

following a phone call made by the pilot, a blue Ford truck with a camper shell arrived to pick up the pilot and subsequently became stuck near the airplane (Record, Vol. IV, p. 292); the prefix of the vehicle's license plate was ML (Record, Vol. IV, p. 293); a Frank Lewis Jackson rented a blue Ford with a Dennis Barrett (Allen) listed as a second driver (Record, Vol. IV, p. 295); the vehicle's license plate number was ML–5614 (Record, Vol. IV, p. 296). It was also corroborated that the airplane's seats had been removed (Record, Vol. IV, p. 256); that several sacks of marijuana had been found in fields in the Fort Morgan area (Record, Vol. II, pp. 36, 38, 48); and that the plane had made landings in Trinidad, Colorado (Record, Vol. IV, p. 276) and Lovington, New Mexico (Record, Vol. IV, pp. 217–218).

Certainly the able trial judge was in the best position to determine the credibility of the witness Venus with respect to the testimony implicating all the co-conspirators. Evidence is not necessarily insufficient merely because the witness' testimony has been contradictory and the explanations therefor difficult of belief. *Batsell v. United States,* 403 F.2d 395 (8th Cir. 1968), *cert. denied,* 393 U.S. 1094, 89 S.Ct. 865, 21 L.Ed.2d 705 (1969). The evaluation of the credibility of witnesses is a matter for the trial court or the jury and is not a function of an appellate court. *United States v. MacClain,* 501 F.2d 1006 (10th Cir. 1974). Hence, we cannot agree with appellants that simply because Venus misidentified one of the co-conspirators that the identification of the others is automatically tainted.

At the Weiss hearing, Venus testified that his identification of Weiss at the trial had been influenced by a specific photograph shown him some six months after the events in question (Record, Vol. VII, pp. 15, 19; Vol. III, pp. 198–199), by the fact that Weiss was seated with the other defendants about whose identity there was no question because they had lived across the hall from him for two months. (Record, Vol. VII, p. 21), by the "tremendous pressure" he was under (Record, Vol. VII, p. 22) because his life had been threatened (Record, Vol. VII, p. 17), and because he just wanted to get it over with (Record, Vol. VII, pp. 16, 41).

On the other hand, his trial identification of Jackson, Allen and Lustig was based on the fact that Lustig lived in the apartment building with him (Venus) and Jackson and Allen "hung out there from February till August. . . ." (Record, Vol. VII, p. 46). The transcript continues at page 46:

"Q. So, if I understand your testimony, what you are saying is that your identification of those three people was influenced by the fact that they lived across the hall from you for a period of time?

A. I had had close contact. They played Ping-pong in my apartment on many occasions."

On cross-examination by Jackson's attorney as to whether he had seen Jackson between February and August of 1974, Venus stated, "We had run across each other from time to time. I lived across the hall from Mr. Lustig, and I would see him [Jackson] in the hall and on the outside from time to time . . . [he] would occassionally drop by my apartment when he was in town. . . ." (Record, Vol. III, p. 134). The evidence, including the testimony of Venus, remain unchanged as to Jackson and Allen following the hearing. Thus the trial court's determination that Venus' recantation testimony was credible in relation to Venus' misidentification of Weiss at trial but did not serve to impeach Venus' trial testimony in relation to Jackson and Allen was not clearly erroneous. The trial court is vested with discretion to grant a new trial for some defendants and to deny it for others. *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Prejudicial error necessitating a new trial for some defendants does not necessarily apply to other defendants. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

## II

■ Appellants' other contention is that they should have been informed of the $300 payment to Venus by DEA agents; Jackson and Allen claim that the nature of the information is such that under *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) a new trial should be granted because:

"The jury might have reached a different result had it known . . . that Venus had been paid $300 dollars by the Drug Enforcement Administration for his testimony." (Brief of Jackson, p. 6.)

We disagree. At Weiss' hearing, the Assistant United States Attorney (Danks) testified that there was nothing in the trial transcript or the papers and files on the case reflecting the $300 dollar payment to Venus (Record, Vol. VII, p. 59).

DEA Agent Keith Clements testified that he had made two payments to Venus: $200 before the grand jury testimony and $100 afterward. He further testified that he did not recall having told anyone at the United States Attorneys' office about the payment (Record, Vol. VII, p. 65), nor did he recall if any other agent had mentioned any payment to a government attorney (Record, Vol. VII, p. 66). DEA agent James Roth testified that to the best of his knowledge, based on his discussions with United States Attorneys in preparation for trial, that no mention was made of the $300 payment (Record, Vol. VII, p. 72). It was also Roth's recollection that none of the numerous investigative reports that he had seen had mentioned the $300 (Record, Vol. VII, pp. 73–74). In explaining the procedure for noting payments to informers, he testified as follows:

"In an investigation which involves an informant where the payment to money—or the payment of money to an informant is part of the investigation and where that information appears in a DEA–6, thats routinely made available to the U.S. Attorney. Its my understanding in this case that *Agent Clements paid $300 to Mr. Venus as a subsistence payment,* and I don't think that would have

gotten into an investigative report. (Emphasis added)." (Record, Vol. VII, p. 75).

Hence, we are not dealing with concealed information, nor, for that matter, any information not discoverable during the course of the trial itself. The record reveals that four separate trial counsel questioned Venus, some of them extensively, about his financial affairs. It was brought out that Venus had retained the $10,000 he had made on the smuggling venture, which the DEA agents knew of (Record, Vol. III, pp. 136–138) and that he (Venus) had been in the conspiracy for the money (Record, Vol. III, p. 146). Venus was asked what his income was for 1974 and whether he had reported the $10,000 received from the alleged co-conspirators to the IRS (Record, Vol. III, pp. 168–169). Venus stated that he had received his flying training at government expense (Record, Vol. III, p. 175) and that he had not paid his 1974 taxes as of June 1975 (Record, Vol. III, p. 168). Not once was Venus asked if he had received any payment or reimbursement of any sort in return for his testimony.

■ In *United States v. Agurs, supra,* the Supreme Court undertook to elaborate on the three situations in which *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) arguably applies. The first are those cases in which a prosecutor has knowingly used perjured testimony, e. g., *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1975), *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); the conviction must be set aside if there is a reasonable likelihood that the false testimony could have affected the judgment of the jury. *United States v. Agurs, supra,* 427 U.S., p. 103, 96 S.Ct. 2392.

■ The second line of cases are those similar to *Brady v. Maryland, supra,* in which a pre-trial request has been made for specific evidence. Implicit in the requirement of materiality is the concern that the suppressed evidence might have effected the outcome of the trial. *United States v. Agurs, supra,* p. 104, 96 S.Ct. 2392. It is clear from the facts before us that neither

of these two categories apply here. The testimony regarding the $300 payment is not alleged to be perjurious nor do appellants claim that a specific request was made for this information.

 The third class of cases include those in which no request at all (or merely a general request for information) has been made. The standard of materiality giving rise to the duty of prosecutorial disclosure is discussed at p. 108, 96 S.Ct. at p. 2399.

"For unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose. . . . But to reiterate a critical point, the prosecutor will not have violated his constitutional duty of disclosure unless his omission is sufficient significance to result in the denial of the defendant's right to a fair trial."

 The Constitution does not demand complete disclosure of the prosecutor's files. The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense. *United States v. Agurs, supra,* pp. 109–110, 96 S.Ct. 2392.

 Under this third category where only a general request is made, the burden is on the defendant to establish that the failure to disclose is a denial of due process. *Wagster v. Overberg,* 560 F.2d 735 (6th Cir. 1977); *see also United States v. Hearst,* 424 F.Supp. 307 (N.D.Cal.1976).

*United States v. Agurs, supra,* involved a situation in which the information sought apparently had been available to the prosecution prior to the trial. Jackson and Allen do not claim that the United States Attorney knew of the $300 payment and withheld the information, either deliberately or by accident or negligence. We cannot construe *United States v. Agurs, supra,* as mandating a reversal where, as here, the prosecution was as unaware of the informa-

tion as was the defense. The payment issue then becomes simply newly discovered evidence. Thus the rule to be applied is that adopted by this court in *United States v. Perea, supra.* The information concerning the payment to Venus is simply not such as would probably produce an acquittal on retrial.

In conclusion, the trial court was well aware that Venus' trial testimony against Jackson and Allen was well corroborated by other witnesses and documentation. The later recantation by Venus concerning his trial misidentification of Weiss and the fact that Venus had been paid $300 as subsistence by the DEA do not constitute a basis for a new trial for either Jackson or Allen.

WE AFFIRM.

LOGAN, Circuit Judge, dissenting.

I am convinced we should adopt the *Larrison v. United States,* 24 F.2d 82 (7th Cir. 1928) rule where, as here, recantation or perjury is involved. Applying that test I would reverse and remand for a new trial for both defendant-appellants.

While I am influenced to some extent by the undisclosed $300 payment to the recanting witness Venus, *United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) indicates that normally it is the character of the undisclosed evidence which should determine the case, not the culpability of the prosecutor.

The main basis for my dissent is this: While there was some corroborating evidence, the government's case depended largely upon the testimony of Venus who was given immunity. Venus identified Weiss, who was convicted as a coconspirator, as the person who flew with him in a small private airplane on at least one round trip to Mexico, where they were together without other companions for many hours. He now recants that testimony and says the Weiss he identified positively at the trial is not the same person who accompanied him on the trip and was his coconspirator. I cannot believe that a person can spend several hours alone with another under these circumstances and then mistakenly identify

that companion, absent proof the individual has an identical twin. I cannot help but believe that if a jury were told of this misidentification or recantation, it would affect substantially their judgment as to Venus' credibility in linking Jackson and Allen to the conspiracy. I realize that the other defendants made mighty attacks upon Venus' credibility at the trial, but that is all the more reason why this recantation as to Weiss' identification would be more likely to affect the jury's verdict as to the other defendants.