**W. Thomas HOLMES, Appellant,**

v.

**Waldon V. BURR, Sheriff of Pima County, Arizona, Appellee.**

No. 71–2724.

United States Court of Appeals, Ninth Circuit.

Oct. 1, 1973.

Certiorari Denied Dec. 17, 1973. See 94 S.Ct. 850.

**56**

Raul H. Castro (argued), Tucson, Ariz., for appellant.

John S. O'Dowd, Asst. Atty. Gen. (argued), Gary K. Nelson, Atty. Gen., Tucson, Ariz., for appellee.

## OPINION

Before BARNES and HUFSTEDLER, Circuit Judges, and LUCAS,* District Judge.

BARNES, Circuit Judge:

W. Thomas Holmes, appellant, is a former Arizona attorney convicted of grand theft of money under false pretenses in an Arizona state court. The state court found that Holmes fraudulently obtained $1,000 from a client, Sanford Marburger, a Tucson liquor store proprietor. Marburger claimed that the $1,000 was given to Holmes for payment of a fine imposed for an alleged liquor license violation of which Holmes had informed him. Subsequent to Holmes' receipt of the money, Marburger discovered that no fine had been levied, and no fee had been paid on his behalf.

In cooperation with the Arizona State Liquor Department, Marburger engaged petitioner in a telephone conversation from the Liquor Department office on August 23, 1968. The parties discussed the alleged license violation and fine. With Marburger's consent, but without a warrant, the conversation was overheard and recorded by the state officials. The tape recording was admitted into evidence at Holmes' trial over timely objection.

Holmes unsuccessfully appealed his conviction alleging in part that the recording violated his right to privacy under the Fourth and Fourteenth Amendments, State v. Holmes, 13 Ariz. App. 357, 476 P.2d 878 (Ct.App.1970). Further state remedies were exhausted, and a petition for Writ of Habeas Corpus was filed in the United States District Court for the District of Arizona pursuant to Chapter 153 of Title 28, United States Code. Upon a hearing, the petition was denied. The case is here on appeal of that decision. Our jurisdiction rests in 28 U.S.C. §§ 1291 and 2253.

Holmes alleges several errors. We find only one question to have merit: whether the eavesdropping and recording of the Marburger-Holmes conversation violated Holmes' right to privacy pursuant to the Fourth and Fourteenth Amendments; or more specifically, his right to be secure in his person from unreasonable searches and seizures. For this reason, and for purposes of judicial economy, we limit our discussion to this issue.

Prior to the Supreme Court's ruling in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), government interception of oral communications was permissible where one party to the conversation gave prior consent. On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952); Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957); Lopez v. United States, 373 U.S. 427, 83 S. Ct. 1381, 10 L.Ed.2d 462 (1963). *And see generally,* Annot., § III.B 97 A.L.R. 2d 1283, 1302; Annot., § 5, 9 A.L.R.3d

---

* Honorable Malcolm M. Lucas, United States District Judge for the Central District of California, sitting by designation.

423, 434. It is now argued by Holmes, and it is the position of the dissent, that *Katz* makes consensual eavesdropping by the Government unconstitutional. We hold that the principles enunciated in *On Lee, Rathbun,* and *Lopez,* are not unconstitutional, and therefore remain binding on the federal courts. United States v. Puchi, 441 F.2d 697 (9th Cir. 1971), cert. denied 404 U.S. 853, 92 S.Ct. 92, 30 L.Ed.2d 92 (1971).

Each of these cases is in certain respects factually similar to the matter before us. On Lee v. United States, *supra,* involved a face to face conversation between an indicted, but unconvicted, criminal defendant, and an old friend and accomplice, turned government informant. The informant elicited incriminating statements from On Lee to which the government informant was permitted to testify at On Lee's trial. Holmes argues, and the dissent concludes, that *On Lee* has been so eroded by recent Supreme Court decisions, particularly Katz v. United States, *supra* that it is no longer a controlling precedent. While we do not find that *On Lee* is not controlling, we do note that it has been severely criticized. See the concurring opinion of Warren, C. J., in Lopez v. United States, *supra,* 373 U. S. at 441–446, 83 S.Ct. 1381. The thrust of the criticism, however, has been directed to the prosecution's failure in *On Lee* to call the informant-accomplice to testify. Unlike the posture of the informant in *On Lee,* Marburger testified himself; and the conversation, which was recorded here, was only used to corroborate Marburger's testimony—it was not primary evidence.

The consenting party to the intercepted conversation in Rathbun v. United States was the victim of a crime perpetrated by the non-consenting party, as Marburger was the victim of a crime perpetrated by Holmes. Similarly, the eavesdropping was accomplished through a regularly used telephone extension; and the evidence obtained was used for corroboration purposes. With respect to the parties' privacy rights, the Supreme Court stated:

"Each party to a telephone conversation takes the risk that the other party may have an extension telephone and may allow another to overhear the conversation. When such takes place there has been no violation of any privacy of which the parties may complain." Rathbun v. United States, *supra,* 355 U.S. at 111, 78 S.Ct. at 164.

The only real distinction between *Rathbun* and *Holmes* is that Holmes' conversation was recorded. However, since the constitutional question centers around the *interception* by a government third party, we do not find the distinction in the *means of disclosure* dispositive.

We also note that *Rathbun* was approved by the Supreme Court in a decision subsequent to *Katz.* Lee v. Florida, 392 U.S. 378, 381, 88 S.Ct. 2096, 20 L. Ed.2d 1166 (1968).

In Lopez v. United States, *supra,* an Internal Revenue Agent was equipped with a pocket tape recorder for the purpose of obtaining corroborative evidence of a bribe. During the recorded conversation, Lopez made additional bribes; and he was convicted only for the bribes made during that conversation. In upholding the admission into evidence of the recording, the Supreme Court first noted that the agent had a clear right to be present at the conversation in Lopez's office, and to which the agent had been invited, and to testify as to the subject matter of the conversation at Lopez's trial. For this reason, there was

"no 'eavesdropping' whatever in any proper sense of that term. The Government did not use an electronic device to listen in on conversations it could not otherwise have heard. Instead, the device was used only to obtain the most reliable evidence possible of a conversation in which the Government's own agent was a participant and which that agent was fully entitled to disclose." Lopez v. United

States, *supra,* 373 U.S. at 439, 83 S.Ct. at 1388.

With respect to an alleged· invasion of Lopez's right to privacy, the court stated that "the risk that (Lopez) took in offering a bribe to (the Government agent) fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording." *Id.; Cf.* Hoffa v. United States, 385 U.S. 293, 302, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

Although the instant case is factually closer to *Rathbun* (because *Rathbun* was concerned with an eavesdropping, and there was no eavesdropping present in *Lopez*), the Court's concern in *Lopez* with the preservation of accurate evidence is relevant to the Marburger-Holmes conversation. In this connection, we find that the use of the recording at Holmes' trial insured that the jury would hear exactly what Marburger heard. In her dissent, Judge Hufstedler states that one of the dangers of the recorded conversation is that the recording does not record facial expressions or other bodily gestures inherent in normal conversation. Without discussing the validity of this concern, we merely note that it is not appropriate under the facts of this case: facial expressions and bodily gestures were not transmitted over the telephone to Marburger; and the jury obtained the precise communication that Marburger received.

Katz v. United States is said to make the holdings in *On Lee, Rathbun,* and *Lopez* nugatory, not because of the factual holding in *Katz,* but because of the principles enunciated therein. In *Katz* a listening and recording device was attached to a public telephone booth by Government officials. No warrant had been obtained, and neither party to the conversation granted permission to the government for the latter's action. The Supreme Court held that "the Fourth Amendment protects people, not places," and disallowed the evidence, overruling the "trespass" approach to the Fourth Amendment in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L. Ed. 944 (1928), and Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L. Ed. 1322 (1942). The Court stated that the government's activities "violated the privacy upon which . . . (Katz) . . . justifiably relied while using the telephone booth and thus constituted a search and seizure within the meaning of the Fourth Amendment." 389 U.S. at 351–353, 88 S.Ct. at 511–512.

We first turn to circuit decisions. My sister Hufstedler disposes of the conclusions of other circuits approving "consensual" electronic surveillance by a brief mention in footnote 30 of her dissent. She does not discuss them, but dismisses them by the conclusion: "None of them undertakes any independent analysis. . . ."

Eight other circuits have supported this majority opinion (in addition to the Ninth) and declined to follow the position urged by the dissent.

Each have considered the question of the effect of *Katz* on consensual interception of oral communications. Each one has held that *Katz* is not applicable. Dancy v. United States, 390 F.2d 370 (5th Cir. 1968), in which *Katz* was held not to control the admission of a government agent's testimony obtained via a transmitter on the person of an informant; Holt v. United States, 404 F.2d 914 (10th Cir. 1968), cert. denied, 393, U.S. 1086, 89 S.Ct. 872, 21 L.Ed.2d 779 (1969), in which the recorded conversation between the defendant and an informant was admitted for corroboration purposes, notwithstanding *Katz*; United States v. Kaufer, 406 F.2d 550 (2d Cir. 1969), aff'd per curiam on other grounds, 394 U.S. 458, 89 S.Ct. 1223, 22 L.Ed.2d 414 (1969), in which *Lopez* and *Rathbun* were held to permit the admission of a recorded conversation of a bribe directed to a government agent, notwithstanding *Katz*; United States v. Gardner, 416 F.2d 879 (6th Cir. 1969), where *On Lee* was held to control the admission of testimony by a government agent obtained via transmitter attached

to the person of an informant; and in which the court held that *On Lee* would continue to apply until overruled by the Supreme Court, citing United States v. Miller, 316 F.2d 81, 83 (6th Cir. 1963), cert. denied, 375 U.S. 935, 84 S.Ct. 335, 11 L.Ed.2d 267 (1963); United States v. DeVore, 423 F.2d 1069 (4th Cir. 1970), cert. denied, 402 U.S. 950, 91 S.Ct. 1604, 29 L.Ed.2d 119 (1971), in which a recorded conversation between a government agent and the defendant was admitted into evidence for corroboration purposes on the basis of *Lopez* and *Hoffa*, *Katz* not controlling; United States v. Hickman, 426 F.2d 515 (7th Cir. 1970), cert. denied, 402 U.S. 966, 91 S. Ct. 1632, 29 L.Ed.2d 130 (1971), where evidence was admitted at the defendant's trial which was obtained by government agents listening on a regularly used extension telephone at a police station; and *Rathbun* and Lee v. Florida, *supra,* were held to control the question of the defendant's right to privacy under the Fourth Amendment; United States v. Riccobene, 320 F.Supp. 196 (E.D.Pa.) (1970), aff'd 451 F.2d 587 (3d Cir. 1971), where *Rathbun* and *Lopez* were held to control the admission into evidence for corroboration purposes of a recorded telephone conversation between a government witness and the defendant, *Katz* not controlling; United States v. Skillman, 442 F.2d 542 (8th Cir. 1971), cert. denied, 404 U.S. 833, 92 S.Ct. 82, 30 L.Ed.2d 63 (1971), in which the recorded conversation of the defendant and a co-conspirator was admitted into evidence for the purpose of impeachment on the basis of *Lopez.*[1]

The Government argues that on the facts of this case, *Katz* is not controlling; instead, they would have the court rely upon United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971). In *White,* a radio transmitter was attached to the person of a government informant through which incriminating statements made by White were overheard by government agents. The informant was unavailable for White's trial and the government agents were permitted to testify as to the conversations they overheard. No warrant was obtained for the eavesdropping, but the agents did not have the consent of the informant. The Supreme Court found the evidence permissible notwithstanding the Fourth Amendment.

"If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks." United States v. White, *supra,* 401 U. S. at 751, 91 S.Ct. at 1126.

Holmes would have this Court disregard *White* on the ground that the electronic surveillance was pre-*Katz.* In Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969), the Supreme Court held that *Katz* only applied prospectively.[2] Hence, Holmes urges that *White* was decided on constitutional principles no longer applicable because of *Katz.* This position represents only a partial reading of *White.* The Supreme Court did find that *White* required application of pre-*Katz* doctrine; but the Court also reached the constitutional questions in view of *Katz.*

"In our view, the Court of Appeals misinterpreted both the *Katz* case and the Fourth Amendment and in any event erred in applying the *Katz* case to events that occurred before that decision was rendered by this Court." 401 U.S. at 747, 91 S.Ct. at 1124.

After distinguishing *Katz* on the grounds that there was no consensual in-

---

1. Although United States v. Skillman, *supra,* was decided after the Supreme Court rendered its decision in United States v. White, *infra,* it was decided on pre-*White* analysis.

2. The decision in *Katz, supra,* was rendered on December 18, 1967.

terception, the Court disposed of the Fourth Amendment right to privacy claim.

"Hoffa v. United States, 385 U.S. 293 [87 S.Ct. 408, 17 L.Ed.2d 374] (1966), which was left undisturbed by *Katz,* held that however strongly a defendant may trust an apparent colleague, his expectations in this respect are not protected by the Fourth Amendment when it turns out that the colleague is a government agent regularly communicating with the authorities. In these circumstances, 'no interest legitimately protected by the Fourth Amendment is involved,' for that amendment affords no protection to 'a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.' Hoffa v. United States, at 302 [87 S.Ct. at 413]." · 401 U.S. at 749, 91 S.Ct. at 1125.

Holmes and my sister Hufstedler's dissent strongly urge this Court to disregard *White* on the grounds that *White* was only a plurality decision, and therefore not binding precedent on this Court. In United States v. Puchi, *supra,* however, three judges of this circuit have found that *White* was binding precedent for the admission of a recorded telephone conversation between one Mitchell, a consenting private citizen and a seller of untaxed liquor. United States v. Puchi, *supra,* 441 F.2d at 700. *Accord,* United States v. Caracci, 446 F. 2d 173 (5th Cir. 1971), cert. denied, 404 U.S. 881, 92 S.Ct. 202, 30 L.Ed.2d 162 (1971); United States v. Quintana, 457 F.2d 874 (10th Cir. 1972), cert. denied, 409 U.S. 877, 93 S.Ct. 128, 34 L.Ed.2d 130 (1972); United States v. Dowdy, 479 F.2d 213 (4th Cir. 1973).

Notwithstanding United States v. Puchi, *supra,* we find that for purposes of finding the principles of *Katz* controlling on the issue of consensual third party interception of oral communications, we note that Black, J., concurred in *White* on the grounds that *Katz* was improperly decided. United States v.

White, 401 U.S. at 754, 91 S.Ct. 1122. For this reason, *White* is a majority opinion.

■ For still another reason, we believe *White* is controlling. This Court is without power to overrule *White*. As is aptly stated in a recent District of Columbia Circuit case.

"Petitioner's countervailing thesis questions both the original soundness of (certain) Supreme Court determinations and their continuing vitality in the light of later Supreme Court pronouncements. We think, however, that appellant presents those contentions in the wrong forum. . . . [I]t is for the Supreme Court, not us, to proclaim error in its past rulings, or their erosion by its adjudications since." Breakefield v. District of Columbia, 143 U.S.App.D.C. 203, 442 F.2d 1227 (1970), cert. denied 401 U.S. 909, 91 S.Ct. 871, 27 L.Ed.2d 807 (1971). *Accord:* Cross v. Bruning, 413 F.2d 678, 680 (9th Cir. 1969), cert. denied 396 U.S. 970, 90 S.Ct. 455, 24 L.Ed.2d 437 (1970).

In this opinion, we have not referred to the provisions of 18 U.S.C. § 2511 (2)(c); for while it specifically authorizes the consensual interception, we need not rely on it here.

Holmes and the dissent correctly note that the government's conduct raises serious questions as to the nature and extent on one's right to privacy. We agree. We conclude, however, that the question of the constitutionality of such conduct is foreclosed by *White* and *Puchi*. For this reason, as well as by reason of similar holdings in other circuits, and the total lack of any judicial precedents in support of appellant's position, the decision of the district court denying the petition for Writ of Habeas Corpus is Affirmed.

HUFSTEDLER, Circuit Judge (dissenting):

This case presents serious constitutional questions arising from warrantless interception and recordation of a

telephone conversation between appellant Holmes, a lawyer, and his client, Marburger. The recording was used to convict Holmes of grand theft by false pretenses. Arizona law enforcement officers induced Marburger to place the call and obtained his consent to the officers' monitoring and recording the conversation. Holmes knew nothing about the officers' conduct until he was prosecuted. Throughout the state court proceedings and his federal habeas attack that brings Holmes here, he has insisted that under Katz v. United States (1967) 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, the warrantless interception and recordation of his conversation without his knowledge or consent was constitutionally impermissible and that the admission of the evidence thus obtained invalidated his conviction.[1] *Katz* held that electronic interception and recordation of one end of a telephone conversation without the knowledge or consent of the person whose conversation was overheard and without prior approval by a neutral magistrate was per se unreasonable under the Fourth Amendment.

The narrowest constitutional issue is whether the state overcame the per se unreasonableness of the warrantless electronic surveillance of Holmes' conversation by proof alone that Marburger gave his consent to the surveillance of Holmes. In my view, the Fourth and Fourteenth Amendments, as interpreted by controlling Supreme Court authority, compel a negative answer. Electronic surveillance of Holmes would have been legal if the state had obtained a warrant, a simple procedure in this case.

The state's failure to obtain a warrant rendered the search and seizure constitutionally impermissible.

## I.

Marburger, who owned a liquor store, retained Holmes for an agreed fee of $2000 to represent him in connection with charges against him pending before the Arizona Liquor Department. According to Marburger, Holmes told him in March 1968 that he had settled the charges upon the basis of Marburger's paying a $1000 fine to the Department and receiving a five-day suspension of his liquor license. The day after this conversation Marburger paid Holmes $1000. The Department, in fact, had not levied any fine. Marburger contended that Holmes did not give him a receipt for the $1000. Marburger went to the Arizona Liquor Department for conferences on several occasions, and he eventually agreed to help the Department obtain corroborating evidence of Holmes' duplicity. For about two weeks, Marburger, under the direction of the Arizona authorities, tried unsuccessfully to record face-to-face and telephone conversations with Holmes. On August 23, 1968, more than five months after the alleged commission of the crime, Marburger made the telephone call in issue. Marburger placed the call from the Arizona Liquor Department's office to Holmes' residence. With Marburger's consent, the law enforcement officers listened to the conversation on an extension telephone and electronically recorded it. A transcript of the complete conversation as recorded is set forth below.[2]

---

1. Holmes unsuccessfully raised the issues in his state trial by a pretrial motion to suppress and a renewed motion to suppress at the close of the state's case, by an appeal to the Arizona Court of Appeals, on petition for review to the Arizona Supreme Court, and on petition for certiorari filed with the United States Supreme Court. He again raised the issue below in his petition for federal habeas relief.

2. Child: Hello.
   Marburger: Good evening. Is Mr. Holmes at home?
   Child: Uh, yes.
   Marburger: May I speak to him please?
   Child: O.K.
   Marburger: Thank you.
   Mrs. Holmes: Hello.
   Marburger: Hi Mrs. Holmes, Sandy.
   Mrs. Holmes: Just a minute Sandy.
   Marburger: All right.
   T. Holmes: Hello.
   Marburger: How are you feeling?
   T. Holmes: Oh, terrible Sandy, they're putting me in the hospital I guess.
   Marburger: Oh, my gosh, I hear you been under the weather quite some time.

Holmes' version of the facts differed sharply from Marburger's. He admitted that he received the $1000, denied that he told Marburger that the money was for a fine, insisted that he had given Marburger a receipt for it, and maintained that the payment was part of his legal fees and costs.

Holmes' conviction could not have been sustained without the admission of the recorded conversation because Arizona law requires that a grand theft by false pretenses charge be corroborated by the testimony of two witnesses or of one witness and corroborating circumstances. (Ariz.Rev.Stat.Ann. § 13–664 (1956).) The only evidence against Holmes was Marburger's testimony and the tape of the conversation which was thrice played to the jury.

At no time during the months elapsing between the alleged commission of

T. Holmes: Yeah.

Marburger: Well, I hate like heck to bother you on this except I, I don't know I guess I got a problem on it and I . . .

T. Holmes: Well, what is the problem Sandy?

Marburger: Well, now

T. Holmes: I gave you a receipt and you know, if you recall at the time, I deliberately gave you a receipt.

Marburger: No I got the receipt.

T. Holmes: As an attorney's fees and everything so that you could write it off. In other words you can take it as an expense item.

Marburger: Yeah, but, you see, Uh then I . . .

T. Holmes: Otherwise you can't.

Marburger: Yeah, Well I didn't understand that, see. Now I told, when it came up when I put it on the book I put down, you know, that was a fine paid to the Liquor Department, My accountant picked it up.

T. Holmes: Well you just tell him to un-pick it! And, put it down and just write it off as attorney's fees! He hasn't filed your income tax yet.

Marburger: No, that's the whole thing but he's filed for that month see, that was March.

T. Holmes: Well, he hasn't—you've—what do you mean filed for that month?

Marburger: Look, every month he makes out a profit and loss sheet.

T. Holmes: Oh, well that's all right, but he can change that. That's the reason I deliberately did it that way was so you could take it as a write off.

Marburger: So what shall I tell him? Just that . . .

T. Holmes: Tell him to contact me if he wants to and I'll tell him what to do. It's real simple like. You have the receipt. You have everything. All you do is turn in the receipt to him. Nancy told me you lost the receipt.

Marburger: Well, I couldn't find the first one but Nancy gave me another one so that part's no problem.

T. Holmes: Just hand it to him and say, put it on the books this way and this is the way we do it.

Marburger: Yeah, and then if he says to me what about the fine and all?

T. Holmes: Tell him I took care of that personally, which I did, and that's my business.

Marburger: Tell him you, or me? I mean tell him Sandy Marburger took care of it or what?

T. Holmes: Tell him Tommy Holmes took care of it, but I gave you a bill in that manner and that's the way that he files your tax.

Marburger: OK, OK and then if he's got any problems . . .

T. Holmes: I have my reasons for doing that also Sandy.

Marburger: If he's got any problems, I'll let him call you.

T. Holmes: Have him give me a call.

Marburger: OK.

T. Holmes: Olive will be back in a couple of weeks, I understand, in a couple of weeks and we'll get that other seventy five buck deal straightened out.

Marburger: OK fine.

T. Holmes: As quick as she gets back.

Marburger: OK Well then, I'm sorry I had to bother you on this, Mr. Holmes, but you know me, I don't know anything about and I want to make sure I was doing the right thing.

T. Holmes: Well, you're doing the right thing and that's the reason I did it that way was so that you would have a write off and, and wouldn't have to pay taxes on it.

Marburger: OK fine, OK that's all.

T. Holmes: OK fine.

Marburger: Thank you, listen feel better now, will you?

T. Holmes: All right, well, they're gonna put me in the hospital I guess and go through a bunch of tests. You lay there in bed and you never see anybody—for days, you know, when those doctors get you in there.

Marburger: Well, I sure hope everything works out alright.

T. Holmes: Fine, well I know it will.

Marburger: Thank you, You'll give me a call then when Mrs. Keihl gets back in town.

T. Holmes: I will as quick as she gets back Sandy.

Marburger: OK thank you.

T. Holmes: OK, bye bye.

Marburger: Bye bye.

the offense and the interception of Holmes' conversation in August 1968 did the officers attempt to obtain prior court approval for monitoring and recording Holmes' telephone conversations.

## II.

The fate of any one man enmeshed in the criminal process is never inconsequential. But this is one of those cases in which the issues involved far transcend the particular factual setting in which the constitutional battle is fought. The case presents some of the most vexing and pressing problems of our day: What are the constitutional limitations on governmental electronic intrusions into privacy? Do the Fourth and Fourteenth Amendments circumscribe warrantless electronic intrusions as effectively as they limit corporeal invasions of privacy? Are the protections of the Fourth and Fourteenth Amendments diluted if the person subjected to the warrantless electronic intrusion is suspected of a crime?

Fear of invisible eyes and ears is pervasive. Today's sophisticated electronic devices are capable of surreptitious probing of every aspect of our lives, thus fulfilling Mr. Justice Brandeis' ominous prophecy:

"Subtler and more far-reaching means of invading privacy have become available to the Government. Discovery and invention have made it possible for the Government, by means far more effective than stretching upon the rack, to obtain disclosure in court of what is whispered in the closet.

". . . The progress of science in furnishing the Government with means of espionage is not likely to stop with wire-tapping. Ways may some day be developed by which the Government, without removing papers from secret drawers, can reproduce them in court, and by which it will be enabled to expose to a jury the most intimate occurrences of the home." (Olmstead v. United States (1928) 277 U.S. 438, 473–474, 48 S.Ct. 564, 570–571, 72 L.Ed. 944 (dissenting op'n).)

Public fear of omnipresent electronic surveillance has escalated with increasing revelations of widespread wire-tapping, bugging, monitoring, and recording. Reported statistics of court-ordered interceptions of wire and oral communications show that, since the enactment of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510–20), authorized interceptions increased 184 percent.[3] "National Security" installations of electronic surveillance devices reported by

3. FEDERAL AND STATE WIRETAPPING AND ELECTRONIC SURVEILLANCE

*Court Authorized Devices*

| *Year* | *Federal* | *State* | *Total No.* | *Total No. of Days In Actual Use* |
|--------|-----------|---------|-------------|-----------------------------------|
| 1968* | 0 | 174 | 174 | (Unavailable) |
| 1969 | 33 | 269 | 302 | 9,019 |
| 1970 | 183 | 414 | 597 | 11,200.5 |
| 1971 | 285 | 531 | 816 | 14,582.5 |
| 1972 | 206 | 649 | 855 | 15,562** |

\* The 1968 reporting period covered only June 20, 1968, to December 31, 1968.

\*\* This figure is lower than the actual total since this information was not provided by all reporting jurisdictions.

Source: Administrative Office of the U.S. Courts, Report on Applications for Orders Authorizing or Approving the Interception of Wire Or Oral Communications for 1968, 1969, 1970, 1971, 1972.
*See also* United States v. United States District Court (1972) 407 U.S. 297, 313 n. 4, 92 S.Ct. 2125, 32 L.Ed.2d 752.

the Department of Justice during the period 1969–1970, made without court approval, were massive; one of these "national security" wiretaps monitored more than 900 conversations during a 14-month period.[4] Government agencies have installed secret observation booths in offices and restrooms.[5] The Government's uninvited ears and eyes have conjoined its cybernetic memory to compile hundreds of thousands of dossiers on high political figures,[6] domestic political organizations,[7] dissident groups,[8] black studies programs,[9] and average citizens.[10]

4. United States v. United States District Court, *supra* at 325, 92 S.Ct. 2125 (Douglas, J., concurring).

During the two-year period 1969–1970, the Department of Justice installed, without court approval, 207 "national security" electronic devices. The duration of use of such devices far surpassed those authorized by court orders during the same period. *See id.* at 334, 92 S.Ct. 2125 (appendix to op'n of Douglas, J., concurring):

FEDERAL WIRETAPPING AND BUGGING 1969–1970

| | Court Ordered Devices | | Executive Ordered Devices | | |
| --- | --- | --- | --- | --- | --- |
| | | | | Days in Use | |
| | | | | Minimum | Maximum |
| Year | Number | Days in Use | Number | (Rounded) | (Rounded) |
| 1969 | 30 | 462 | 94 | 8,100 | 20,800 |
| 1970 | 180 | 2,363 | 113 | 8,100 | 22,600 |

| | Ratio of Days Used Executive Ordered: Court Ordered | | Average Days in Use Per Device | | |
| --- | --- | --- | --- | --- | --- |
| | | | Court Ordered | Executive Ordered Devices | |
| Year | Minimum | Maximum | Devices | Minimum | Maximum |
| 1969 | 17.5 * | 45.0 * | 15.4 | 86.2 | 221.3 |
| 1970 | 3.4 | 9.6 | 13.1 | 71.7 | 200.0 |

\* Ratios for 1969 are less meaningful than those for 1970, since court-ordered surveillance program was in its initial stage in 1969.

Source:

(1) Letter from Assistant Attorney General Robert Mardian to Senator Edward M. Kennedy, March 1, 1971. Source figures withheld at request of Justice Department.

(2) 1969 and 1970 Reports of the Administrative Office of the U.S. Courts.

———◆———

5. *See generally* Hearings on Invasion of Privacy Before the Subcomm. on Administrative Practice and Procedure of the Senate Comm. on the Judiciary, 89th Cong., 1st Sess. (1965).

6. United States Army domestic intelligence operations have reportedly focused upon United States Senators Sam Ervin, Fred Harris, Harold Hughes, Edward Kennedy, George McGovern, and Edmund Muskie. N. Y. Times, Feb. 29, 1972, at 1, col. 3. Five United States Representatives, three Governors, and a Lt. Governor were also subjected to Army surveillance. *Id.* cols. 3–4. "Indeed, the electronic ear was said to have turned on a Justice of [the United States Supreme] Court." Williamson v. United States (1972) 405 U.S. 1026, 1028, 92 S.Ct. 1323, 1324, 31 L.Ed.2d 487 (Douglas, J., dissenting from denial of certiorari).

7. Senator Sam Ervin, Jr., Chairman of the Senate Subcommittee on Constitutional Rights, has disclosed that organizations subjected to Army surveillance have included the NAACP, ACLU, Operation Breadbasket, the Urban League, and the States' Rights Party. Brief for Senator Sam Ervin, Jr., as Amicus Curiae at 10, Laird v. Tatum (1972) 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154. Army operations also infiltrated Resurrection City, the Poor People's Campaign, the 1968 Democratic and Republican Party nominating conventions. Federal Data Banks, Computers and the Bill of Rights, Hearings Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary, 92d Cong., 1st Sess., pt. 1, at 197–201 (1971).

See notes 8, 9 & 10 on page 65.

The full measure of the governmental electronic surveillance problem by no means emerges from these reports, which almost entirely involve probing without the knowledge of anyone whose activities were watched, heard, or recorded. The far more pervasive spectre is presented by governmental interceptions and recordings accomplished with the cooperation of one party to a communication but without the knowledge of the other. Such "participant monitoring" and "participant electronic surveillance" are much more widespread; estimates of such participant activities run in the tens of thousands per year.[11]

In a pluralistic society dedicated to liberal democratic traditions, confidential communication serves as a lubricant for the smooth functioning of social and political institutions. Without "uninhibited, robust, and wide-open" public and private expression on the great issues of our day, as well as private discussion about the mundane, the trivial, and the banal, a once free society will soon become a nation of "hagridden and furtive" people.[12]

"The dangers posed by wiretapping and electronic surveillance strike at the very heart of the democratic philosophy. A free society is based on the premise that there are large zones of privacy into which the government may not intrude except in unusual circumstances.

"Such practices can only have a damaging effect on our society. . . . The time may come when no one can be sure whether his words are being recorded for use at some future time; when everyone will fear that his most secret thoughts are no longer

---

8. *See* Federal Data Banks, Computers and the Bill of Rights, *supra* note 7, at 201–06. *See also* N. Y. Times, April 12, 1970, at 1, col. 2 ("U. S. To Tighten Surveillance of Radicals"); N. Y. Times, Dec. 14, 1969, at 1, col. 1 ("F.B.I.'s Informants and 'Bugs' Collect Data on Black Panthers"); Washington Post, May 12, 1972, § D, at 21, col. 5 ("When the FBI Calls, Everybody Talks"); Washington Post, May 16, 1972, § B, at 15, col. 5 ("Black Activists Are FBI Targets"); Washington Post, May 17, 1972, § B, at 13, col. 5 ("Bedroom Peeking Sharpens FBI Files"). The FBI allegedly investigated Daniel Schorr, a CBS television correspondent critical of the Government. N. Y. Times, Nov. 11, 1971, at 95, col. 4; N. Y. Times, Nov. 12, 1971, at 13, col. 1. The FBI has also been charged with electronic surveillance of Dr. Martin Luther King (V. Navasky, Kennedy Justice 135–55 (1971)) and with wiretapping Mrs. Eleanor Roosevelt and John L. Lewis (Theoharis & Meyer, The "National Security" Justification For Electronic Eavesdropping: An Elusive Exception, 14 Wayne L.Rev. 749, 760–61 (1968)).

9. Federal Data Banks, Computers and the Bill of Rights, *supra* note 7, at 185.

10. *See generally* Federal Data Banks, Computers and the Bill of Rights, *supra* note 7; A. Westin & F. Baker, Databanks in a Free Society (1972) (Report of the Project on Computer Databanks of the Computer Science and Engineering Board, National Academy of Sciences); A. Miller, The Assault on Privacy: Computers, Data Banks, and Dossiers (1971); J. Rosenberg, The Death of Privacy (1969); A. Westin, Privacy and Freedom (1967); E. Long, The Intruders: The Invasion of Privacy by Government and Industry. *See also* Laird v. Tatum (1972) 408 U.S. 1, 26, 92 S.Ct. 2318, 33 L.Ed.2d 154 (Douglas, J., dissenting), describing "massive and comprehensive" surveillance of civilians.

11. *E. g.*, A Westin, Privacy and Freedom 131 (1967); Greenawalt, The Consent Problem in Wiretapping & Eavesdropping: Surreptitious Monitoring With the Consent of a Participant in a Conversation, 68 Colum.L.Rev. 189, 212 (1968).

The precise magnitude of this type of clandestine activity defies accurate projection because of the scarcity of reliable empirical data on such police techniques. *Cf.* Note, Police Undercover Agents: New Threat to First Amendment Freedoms, 37 Geo.Wash.L.Rev. 634, 657 (1969). Nevertheless, in terms of an impact on privacy, any constitutional distinction drawn between participant monitoring and interceptions unauthorized by either party must take into account the practical effect of regulating or not regulating the most pervasive form of electronic surveillance.

12. The quoted phrases are borrowed respectively from New York Times v. Sullivan (1964) 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686, and Lopez v. United States (1963) 373 U.S. 427, 470, 83 S.Ct. 1381, 10 L.Ed.2d 462 (Brennan, J., dissenting).

his own, but belong to the Government; when the most confidential and intimate conversations are always open to eager, prying ears. When that time comes, privacy, and with it liberty, will be gone. If a man's privacy can be invaded at will, who can say he is free? . . ." Osborn v. United States (1966) 385 U.S. 323, 353–354, 87 S.Ct. 429, 446, 17 L.Ed.2d 394 (Douglas, J., dissenting).

The corrosive impact of warrantless participant monitoring on our sense of security and freedom of expression is every bit as insidious as electronic surveillance conducted without the consent of any of the parties involved. In terms of the individual's reluctance to speak freely no qualitative difference exists between the danger posed by third party interception and the risk that his auditor has sanctioned a secret recording of their conversation.[13] Extensive police-instigated and clandestine participant recordings, coupled with their use as evidence of any self-incriminating remarks of the speaker, pose "a grave danger of chilling all private, free, and unconstrained communication. . . . In a

free society, people ought not to have to watch their every word so carefully." Lopez v. United States, *supra* note 12, 373 U.S. at 452, 83 S.Ct. at 1395 (Brennan, J., dissenting).

### III.

The constitutional issues that Holmes raises could be avoided and the opinion confined to the application of the federal statute outlawing all nonjudicially authorized interceptions of any wire or oral communications (Omnibus Crime Control and Safe Streets Act of 1968),[14] if the Holmes' surveillance did not fall within one of the kinds of surveillance expressly excepted by the Act. That avenue is foreclosed, however, because governmental participant monitoring is expressly exempted by 18 U.S.C. § 2511(2)(c):

"It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."

13. Cf. Greenawalt, *supra*, note 11, at 221: "[W]idespread participant monitoring would be likely to have a subtle negative effect on people's willingness to communicate."

14. Title III, § 802(1), 18 U.S.C. § 2511(1):
"(1) Except as otherwise specifically provided in this chapter any person who—
(a) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication;
(b) willfully uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when—
(i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or
(ii) such device transmits communications by radio, or interferes with the transmission of such communication; or
(iii) such person knows, or has reason to know, that such device or any component thereof has been sent through the mail or transported in interstate or foreign commerce; or

(iv) such use or endeavor to use (A) takes place on the premises of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or (B) obtains or is for the purpose of obtaining information relating to the operations of any business or other commercial establishment the operations of which affect interstate or foreign commerce; or
(v) such person acts in the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States;
(c) willfully discloses, or endeavors to disclose, to any other person the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection; or
(d) willfully uses, or endeavors to use, the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection;
shall be fined not more than $10,000 or imprisoned not more than five years, or both."

Nothing in the brief legislative history of the Act disturbs the literal reading of the text of the subparagraph.[15]

The constitutional problem must be faced whether we ignore the Act altogether and concentrate on Holmes' direct constitutional attack, or we begin with the Act and confront the same constitutional challenge to the quoted exception to the Act. The frontal assault is conceptually neater. I therefore undertake the constitutional analysis independent of the Act, although I am aware of the impact of the analysis on the exception.

For the purpose of this constitutional analysis, I adopt Professor Westin's concept that "privacy" is "the claim of individuals, groups, or institutions to determine for themselves when, how, and to what extent information about them is communicated to others." (A. Westin, Privacy and Freedom (1967) at 7.) This constitutionalized right to privacy protects the individual's interest in pre-serving his essential dignity as a human being.[16]

The generic term "electronic surveillance" is used here to encompass all forms of electronic interception, overhearing, or recording of wire or oral communications. (*Cf.* ABA Project on Standards for Criminal Justice, Standards Relating to Electronic Surveillance § 2.1, at 106–07 (Approved Draft, 1971).). "Participant monitoring" includes three situations; in each, one participant to a communication at the instance of, or under the direction of, a governmental agent or agency, without the knowledge of the second party, (1) himself records the conversation with the second party, or (2) uses an electronic device to transmit the conversation to a government agent or his nominee, or (3) consents to a government agent's or informant's using an electronic device to overhear and to record the communication.[17]  (*See* Greenawalt, *su-*

15. The Senate Judiciary Committee report on the bill refers only once to § 2511(2)(c), noting that "it shall not be unlawful for a party to any wire or oral communication or a person given prior authority by a party to a communication to intercept such communication." S.Rep. No. 1097, 90th Cong., 2d Sess. (1968); 2 U.S.Code Cong. & Ad. News 2182 (1968).

The only explicit reference to § 2511(2)(c) during the Senate floor debate came in the form of an amendment by Sentor Philip A. Hart to limit participant wiretapping to police officers and to eliminate private interception by one party. 114 Cong.Rec. 12508–09 (1968) (remarks of Senator Hart). The final version of the Hart amendment, however, was not intended "in any way [to] limit consensual recording by law enforcement officers or by private persons acting in conjunction with law enforcement officers." *Id.* at 14694–95 (remarks of Senator Hart). The modified amendment was passed without objection. *Id.,* at 14695. This was the last congressional action on the participant monitoring provision. The Act passed in the Senate 72–4 and 369–17 in the House after limited debate of only one day. *Id.* at 14798, 16300.

Mr. Justice Harlan, dissenting in United States v. White (1971) 401 U.S. 745, 791–792, 91 S.Ct. 1122, 28 L.Ed.2d 453, similarly read the history of § 2511(2)(c).

16. " . . . Maintenance of a sense of personal autonomy depends in large part on being able to control the breadth of dissemination of one's intimate concerns. If the only choice were to remain silent or expose one's personal concerns to unknown and unsympathetic listeners, it would be a bleak choice, one that would eventually stultify creative individuality. Private communications are also an important form of emotional release; people need to be able to drop their social masks, to blow off steam against their bosses or the system, to disregard minor social conventions. As Louis Schwartz has put it in answer to' the argument that the innocent have nothing to fear from electronic surveillance, 'Free conversation is often characterized by exaggeration, obscenity, agreeable falsehoods, and the expression of anti-social desires or views not intended to be taken seriously. The unedited quality of conversation is essential if it is to preserve its intimate, personal and informal character.' " Greenawalt, *supra* note 11, at 216–17. (Footnotes omitted.)

17. This conduct is not a wiretap, as that term is usually used. The difference between a wiretap and an eavesdrop accompanied by electronic recording is a difference only in the technology employed. The impact of the intrusion is identical. Section 2511(1)(a) of Title III encompasses both since both are interceptions of a "wire or oral communication."

Confusing terminology must not be permitted to obscure the realities of the interceptions.

*pra* note 11, at 190 n. 9.) Holmes was subjected to participant monitoring of the third type.

## IV.

As Mr. Justice White warned: "Unregulated use of electronic surveillance devices by law enforcement officials and by private parties poses a grave threat to the privacy and security of our citizens." (Berger v. New York (1967) 388 U.S. 41, 112, 87 S.Ct. 1873, 1911, 18 L. Ed.2d 1040 (dissenting op'n).)

The Supreme Court's struggle with this threat began more than 40 years ago with the decision of Olmstead v. United States, *supra*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944. Speaking for the majority, Mr. Chief Justice Taft held that warrantless wiretapping offended neither the Fourth nor Fifth Amendments because there was no corporeal search, no tangible seizure, no trespass, and no coercive physical presence of a government officer.[18]

In the decades following *Olmstead*, two significant developments have occurred: The technology of electronic surveillance has catapulted beyond the crude instrumentalities used by the officers who intercepted the *Olmstead* boot-leggers' conversations, and the exclusionary rule of Weeks v. United States (1914) 232 U.S. 383, 34 S.Ct. 341, 58 L. Ed. 652, became applicable to state courts in Mapp v. Ohio (1961) 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. Nevertheless, the lines of argument drawn by the majority and dissenting opinions in *Olmstead* have endured.

## A.

The *Olmstead* majority perceived the Fourth Amendment as little more than a criminal code to be strictly construed to prevent the escape of the guilty through the aperture created by the *Weeks* exclusionary rule. Mr. Justice Brandeis envisioned the amendment, as did Mr. Justice Bradley before him,[19] as a great constitutional bulwark against unjustified encroachments upon the dignity and autonomy of all men. In his view, the constitutional draftsmen had no crabbed concepts about the need to protect all persons from the oppressive tactics of foreign governments despised by our founders. More than physical intrusions, they would have abhorred an invisible governmental presence against which the householder could neither set his dog nor bar his door.[20] He knew

See generally S. Dash, R. Schwartz & R. Knowlton, The Eavesdroppers 6–8 (1959).

18. Mr. Chief Justice Taft said: "The [Fourth] Amendment does not forbid what was done here. There was no searching. There was no seizure. The evidence was secured by the use of the sense of hearing and that only. There was no entry of the houses or offices of the defendant." (277 U.S. at 464, 48 S.Ct. at 568.) "[Liberal construction of the Fourth Amendment] cannot justify enlargement of the language employed beyond the possible practical meaning of houses, persons, papers, and effects, or so to apply the words search and seizure as to forbid hearing or sight." (*Id.* at 465, 48 S. Ct. at 568.)

19. "The principles laid down in this opinion [Entick v. Carrington, 19 How.St.Tr. 1029 (1765)] affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its em-ployees of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security. . . ." Boyd v. United States (1886) 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746.

20. "The makers of our Constitution," Mr. Justice Brandeis said, ". . . recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment. And the use, as

that governmental interception of the whispers in a closet might reveal dark plots of conspirators instead of confidences exchanged between young lovers, but he realized that the innocent cannot be protected without procedures that may sometimes provide a shield for the wicked. He reminded us that it is "immaterial that the intrusion was in aid of law enforcement. Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficient. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachments by men of zeal, well-meaning but without understanding." (277 U.S. at 479, 48 S.Ct. at 572. Footnote omitted.)

Nothing on the face of the Fourth Amendment compelled Mr. Chief Justice Taft's confining it to corporeal presence or to the seizure of tangibles. The *Olmstead* opinions supply strong evidence that the majority's pinched interpretation of the Fourth Amendment was primarily motivated by their distaste for *Weeks*. (*See, e. g.*, 277 U.S. at 462–63, 467, 468, 48 S.Ct. 564.) [21] To strike a glancing blow to the exclusionary rule, the *Olmstead* majority was willing to contract the Fourth Amendment.

The holding of *Olmstead* was finally overruled in Katz v. United States (1967) 389 U.S. 347, 88 S.Ct. 507, 19 L. Ed.2d 576. "[T]he Fourth Amendment protects people, not places." (*Id.* at 351, 88 S.Ct. at 511.) But the tension between the Taft views and those expressed by Justices Holmes and Brandeis has not dissipated. (*E. g., compare*

the majority/plurality *with* the dissenting and concurring opinions in United States v. White (1971) 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453; Osborn v. United States (1966) 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394; Lopez v. United States (1963) 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462; On Lee v. United States (1952) 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270; Goldman v. United States (1942) 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322.) In contrast to these opinions are those in which unjustified governmental interference with the autonomy of personality has occurred in a setting free from concern over the exclusionary rule. (*E. g.*, Roe v. Wade (1973) 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147; See v. City of Seattle (1967) 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943; Camara v. Municipal Court (1967) 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930; Griswold v. Connecticut (1965) 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510; Louisiana v. NAACP (1961) 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301; Shelton v. Tucker (1960) 364 U.S. 479, 81 S.Ct. 247, 5 L. Ed.2d 231; Watkins v. United States (1957) 354 U.S. 178, 77 S.Ct. 1173, 1 L. Ed.2d 1273.)

Tucked into *Olmstead* was a passing reference to the theory that persons subjected to warrantless electronic interception volunteer their statements to the Government by their very act of talking to each other.[22] This theory later emerged as the constructive consent and assumption of the risk fictions relied on in On Lee v. United States, *supra*, 343 U.S. at 753–754, 72 S.Ct. 967 [23] and Lo-

---

evidence in a criminal proceeding, of facts ascertained by such intrusion must be deemed a violation of the Fifth." 277 U.S. at 478–479, 48 S.Ct. at 572.

21. Mr. Justice Holmes' famous dissent, championing the exclusionary rule, supports the hypothesis that the underlying quarrel was *Weeks*. 277 U.S. at 469–471, 48 S.Ct. 564.

22. "There was no evidence of compulsion to induce the defendants to talk over their many telephones. They were continually and

voluntarily transacting business without knowledge of the interception." 277 U.S. at 462, 48 S.Ct. at 467.

23. Petitioner had two face-to-face conversations with an old acquaintance in which he made incriminating statements. Unknown to petitioner, the acquaintance was an informer who had secreted on his person a microphone and transmitter by which he sent the conversations to a government agent some distance away. The informant did not testify at trial, but the government agent recited

pez v. United States, *supra,* 373 U.S. at 439, 83 S.Ct. 1381. In *Lopez,* the majority added the variation that a person talking face-to-face with a known government agent assumes the risk that the agent will be able to repeat the conversation either by total personal recall or by a corroborative recording which in its nature is more reliable than human recollection.[24] The theme was replayed in a slightly different key by the plurality in United States v. White, *supra,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453.[25]

Using familiar jurisprudential tools, *Holmes* can be successfully distinguished from every Supreme Court decision directly bearing on the case other than *Katz.* Thus, *On Lee* and *Lopez* not only are factually dissimilar but, more importantly, were based on trespassory concepts discredited by Silverman v. United States (1961) 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734, Osborn v. United States, *supra,* 385 U.S. 323, 87 S.Ct. 429, 17 L. Ed.2d 394, and Berger v. New York, *su-*

*pra,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed. 2d 1040, and destroyed by *Katz.* Rathbun v. United States (1957) 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134, dealt with governmental eavesdropping by extension telephone without electronic recording, and the decision was confined to an interpretation of section 605 of the 1934 Federal Communications Act (47 U.S.C. § 605). Schwartz v. Texas (1952) 344 U.S. 199, 73 S.Ct. 232, 97 L. Ed. 231, involved facts similar to *Rathbun,* but the decision was based on the pre-*Mapp* authority refusing to apply the exclusionary rule to state courts. *Schwartz* was overturned by Lee v. Florida (1968) 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166, a post-*Mapp* case, holding inadmissible under section 605 telephone conversations overheard on a party line and recorded. Lewis v. United States (1966) 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312, and Hoffa v. United States (1966) 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374, like *Holmes,* concerned

the conversation he had overheard. Although the holding was based on the majority's conclusion that the Fourth Amendment was not violated because there had been no trespass, Mr. Justice Jackson introduced the *Olmstead* subtheme, stating: "Petitioner was talking confidentially and indiscreetly with one he trusted, and he was overheard. This was due to aid from a transmitter and receiver, to be sure, but with the same effect on his privacy as if agent Lee had been eavesdropping outside an open window." (343 U.S. at 753–754, 72 S.Ct. at 972.)

Agent Lee was nowhere near the conversations and eavesdropping by machine is not the same as overhearing by human ears. No analogy to the ancient art of eavesdropping exists unless a fiction is indulged that a person physically absent becomes constructively present close enough to the conversation to hear and far enough to avoid a trespass. Curiously enough, Mr. Justice Jackson, a few paragraphs earlier, had quickly dispatched the fiction of trespass *ab initio* as an historical anachronism which should not be transported into criminal cases. (*Id.* at 752, 72 S.Ct. 967.)

24. Petitioner had a face-to-face conversation with an Internal Revenue Agent, Davis, in which petitioner tried to bribe Davis, who had recorded the conversation using a device hidden on his person. The majority perceived no difference between secret record-

ing and the recollection of the agent for Fourth Amendment purposes, except that the device provided "the most reliable evidence possible of a conversation in which the Government's own agent was a participant and which that agent was fully entitled to disclose . . . . . We think the risk that petitioner took in offering a bribe to Davis fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording." (373 U.S. at 439, 83 S.Ct. at 1388.) Mr. Justice Harlan, who wrote the opinion, later repudiated that view. (United States v. White, *supra,* 401 U.S. at 788 n. 24, 91 S.Ct. 1122.)

25. Acting without a warrant, government agents overheard incriminating conversations between White and a confidant-government informant who transmitted his conversations with White to the agents by means of a radio transmitter concealed on his person. The informant was not produced at trial. The electronically eavesdropping government agents testified to the intercepted conversations. Mr. Justice White, speaking for a plurality (he did not command a majority on the point), said that a person contemplating illegal activity "must realize and risk" that his confidant may be a police informer who is fully wired for sound. (401 U.S. at 752–753, 91 S.Ct. 1122.)

the use of confidants who were secretly governmental informers, but in neither case was electronic surveillance employed. The facts in *White* were closer to those in *On Lee* than to *Olmstead* or *Holmes*. But of much greater significance, *White* necessarily applied pre-*Katz* law because the electronic surveillance of White occurred before *Katz* was decided, and *Katz* had been earlier held nonretroactive in Desist v. United States (1969) 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248. United States v. White, *supra*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453, is nevertheless important because it reveals continuing reliance by some of the Justices on the assumption of the risk doctrine.[26]

### B.

*Katz* does apply to *Holmes* because the interception occurred after *Katz* became effective. However, two factual dissimilarities exist: (1) the mechanics of interception were not the same in both cases, and (2) *Katz* did not involve participant monitoring. In *Katz*, without the knowledge of either party to the conversation, the Government placed an electronic listening and recording device outside the public booth in which Katz was telephoning and thereby obtained evidence used to convict him for illegally transmitting wagering information. *Katz* itself defeats any argument that governmental choice of electronic devices is constitutionally significant. (*See, e. g.*, 389 U.S. at 352–353, 88 S.Ct. 507.) Thus, the only remaining issue is whether the participant feature of *Holmes* can defeat the warrant requirement of *Katz*.

The majority opinion argues that it does, relying on the theories of consent and assumption of the risk. Neither theory is acceptable.

Holmes never consented to having his conversations overheard by third parties or recorded by Marburger or other government agents. As the Court observed in *Katz*, "the very nature of electronic surveillance precludes its use pursuant to the suspect's consent." (389 U.S. at 358, 88 S.Ct. at 515.) Moreover, Marburger cannot waive Holmes' Fourth Amendment rights. To say that Marburger's consent is Holmes' consent is a fiction that has been expressly rejected by the Supreme Court in the context of warrantless searches and seizures. Marburger can no more consent for Holmes than a hotel manager can consent to a search of a guest's room on behalf of the guest (Stoner v. California (1964) 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856; *see* United States v. Jeffers (1951) 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59), or a landlord can give permission attributable to his tenant to search his tenant's quarters (Chapman v. United States (1961) 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828).[27]

Although a majority of the Supreme Court has never relied on the assumption of the risk doctrine to validate interception of private conversations, references to the doctrine have threaded through a number of opinions applying pre-*Katz* law. This doctrine, relied upon by the majority in the case at bench, is a hybrid of factual and fictitious elements and of individual and societal judgments. If Holmes knew that his

---

26. *See* United States v. White, *supra* at 754, 91 S.Ct. 1122 (White, J.). Although the holding in *White* was based upon the nonretroactivity of *Katz*, several of the Justices did express views on the effect of *Katz* on participant electronic surveillance. Mr. Justice White, writing for the Chief Justice and Justices Stewart and Blackmun, suggested that *On Lee* remained sound law. Justices Brennan, Douglas, Harlan, and Marshall each wrote separate opinions arguing that the result in *On Lee* could not survive *Katz*. Mr. Justice Black, concurring in the judgment of the Court, did not address this issue, merely reasserting the position taken in his *Katz* dissent that electronic surveillance was not within the ambit of the Fourth Amendment.

27. *See also* Note, Consent Searches: A Reappraisal After Miranda v. Arizona 67 Colum.L.Rev. 130 (1967); The Association of the Bar of the City of New York, Committees on Federal Legislation and Civil Rights, Proposed Legislation on Wiretapping and Eavesdropping After Berger v. New York and Katz v. United States 23 (1968).

conversation might be electronically intercepted by the government, or if warrantless electronic monitoring were so pervasive that he is chargeable with such knowledge, a factual foundation would exist for invoking the venerable assumption of the risk doctrine. However, if he did not know and if he had no reason to be aware of the risk, that doctrine is inapt. To say that a person "assumes the risk" of electronic surveillance, although he was rightfully oblivious to the risk, is to mislabel a newly created rule of law limiting the scope of the Fourth Amendment. Indeed, none of the opinions in which the doctrine has been invoked to defeat Fourth Amendment claims attempts to justify its application on factual grounds. Instead, the result is explained by resorting to two intertwined theories: First, one must realize that a person in whom he confides may repeat the conversation to another; and he must also realize that his confidant may be a government informer who will choose to repeat the conversation by electronically recording and transmitting it. Assignment of both risks to a person who may be totally ignorant of the opportunity for electronic surveillance is considered appropriate because no significant difference exists between talking to a person who is electronically unaided and to one who is "wired for sound." (See, e. g., United States v. White, supra, 401 U.S. at 751, 91 S.Ct. 1122 (White, J.); Lopez v. United States, supra, 373 U.S. at 439–440, 83 S.Ct. 1381.) Second, a person contemplating illegal activity assumes some risks that others do not. Among these risks is subjection to warrantless electronic surveillance. (United States v. White, supra, 401 U.S. at 752, 91 S.Ct. 1122.) Neither theory withstands analysis.

Repetition of conversations thought to be confidential is a known risk. However, the risk that one's trusted friend may be a gossip is of an entirely different order than a risk that the friend may be transmitting and recording every syllable. The latter risk is not yet rooted in common American experience, and it should not be thrust upon us: the differences between talking to a person enswathed in electronic equipment and one who is not are very real, and they cannot be reduced to insignificance by verbal legerdemain. All of us discuss topics and use expressions with one person that we would not undertake with another and that we would never broadcast to a crowd. Few of us would ever speak freely if we knew that all our words were being captured by machines for later release before an unknown and potentially hostile audience. No one talks to a recorder as he talks to a person.

Proponents of the assumption of the risk doctrine, apparently recognizing the significant intrusion upon an individual's privacy caused by participant monitoring, do not say that everyone must anticipate and risk warrantless surveillance; rather, they limit its application to those who contemplate illegal activity. But never do these proponents explain how, absent the Fourth Amendment requirement of antecedent justification before a neutral magistrate, the sinful can be separated from the saintly without probing everyone or leaving the selection to the unbridled discretion of government agents. What is left of anyone's justifiable reliance on privacy (see Katz v. United States, supra, 389 U.S. at 353, 88 S.Ct. 507) if everyone must realize that he will be free from warrantless electronic intrusion only so long as someone in the government does not suspect him of improper conduct or wrong thinking?[28]

Adoption of the assumption of the risk theory ultimately rests on the cynical conclusion that a warrantless search is justified by what it reveals. The conclusion has been firmly rejected in the context of physical entries and tangible

---

28. See A. Westin, supra at 340–49 and authorities cited. See generally Fried, Privacy, 77 Yale L.J. 475, 478–83 (1968).

seizures (*e. g.*, United States v. Di Re (1948) 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 210; Byars v. United States (1927) 273 U.S. 28, 29, 47 S.Ct. 248, 71 L.Ed. 520) and in nonparticipant electronic surveillance (Katz v. United States, *supra*, 389 U.S. at 357, 88 S.Ct. 507). It should not be given vitality in participant monitoring cases.

C.

After mistaken notions of consent are corrected and the rubble of fictions is removed from electronic surveillance, participant monitoring is revealed to be squarely within the rule of *Katz*.[29] In terms of expectations of privacy, expressed either as a subjective state of mind of the monitored suspect or as a societal judgment, Holmes' situation cannot be distinguished from Katz's. Holmes was just as ignorant as Katz of the presence of hovering governmental ears; and society has not yet reached a judgment that a lawyer talking on his residential telephone to a client must have a lesser expectation of privacy than a bookmaker transmitting wagering information to a confederate from a public telephone booth. Holmes' expectation of privacy, which was surely no less reasonable than Katz's, did not become unreasonable simply because his client, without his knowledge, invited the government to overhear and to record the conversation. *Katz* refused to leave the choice of suspects to be electronically monitored to the unreviewed discretion of government agents. The Government

cannot escape *Katz* by committing the responsibility for surveillance to a private citizen. The guardian of the individual's right of privacy is the neutral magistrate, not a government informant.

The burden was on the state to obtain a warrant prior to subjecting Holmes to electronic surveillance (*Katz, supra*), or to prove facts that would bring the search and seizure within one of the carefully delineated exceptions to the warrant requirement. (United States v. United States District Court, *supra*, 407 U.S. at 318, 92 S.Ct. 2125.) Neither burden was met, and the surveillance was constitutionally impermissible.[30]

D.

Even if *Katz* could be successfully distinguished from *Holmes*, leaving the question of the constitutionality of participant surveillance open, the denouement would be the same. The constitutional values restated and reinforced in *Katz* and United States v. United States District Court, *supra*, are equally threatened by participant and nonparticipant warrantless electronic surveillance. Nevertheless, this constitutional bedrock has been obscured by three arguments which have been wholly or partially articulated to support warrantless electronic surveillance: (1) electronic recording produces more reliable evidence than human recollection; (2) law enforcement officers need unhampered authority to engage in electronic surveillance to protect us from crime; and (3) the exclusion of evidence obtained

29. I have not overlooked the impact of the Fifth Amendment on participant surveillance. As Mr. Justice Bradley observed in Boyd v. United States, *supra* note 19, in the area of warrantless intrusion accompanied by extraction of incriminating testimony, the Fourth and Fifth Amendments "run almost into each other." (116 U.S. at 630, 6 S.Ct. 524.) The Court has repeatedly recognized the interaction of the Fourth and Fifth Amendments in protecting privacy and freedom. *E. g.*, Lopez v. United States, *supra*, 373 U.S. at 456, 83 S.Ct. 1381 (Brennan, J., dissenting); Wong Sun v. United States (1963) 371 U.S. 471, 484, 83 S.Ct. 407, 9 L. Ed.2d 441; Feldman v. United States (1944)

322 U.S. 487, 489, 64 S.Ct. 1082, 88 L.Ed. 1408.

30. I am aware of the authorities from this circuit and others upholding the constitutionality of warrantless participant electronic surveillance. Some of the cases cited by the majority can be effectively distinguished from *Holmes*. Others cannot. In my view, however, none of the circuit decisions can be harmonized with controlling Supreme Court authority. None of them undertake any independent analysis that supplies a defensible rationale for depriving a person subjected to warrantless participant surveillance of the protection of the Fourth Amendment.

by electronic surveillance frees the guilty to the detriment of society.

Are machines more reliable than human beings? Unlike human beings, a machine neither remembers nor forgets. If the concept of reliability rested solely on ability to reproduce a conversation word for word, we would say machines are more reliable. But the concept is not that shallow. Machines are capable of distortion without regard to tampering and despite the invisibility of their presence. A tape recording preserves the spoken words, but not the gestures, facial expressions, and other subtle details which are often far more eloquent media than the words used to convey thoughts and feelings. Focus on a single element in a total environment can produce deceptive results. For example, a snapshot captures a person as he appeared in a fraction of a second. Is the picture an accurate portrayal of the person? Anyone who has seen a newspaper photograph of himself taken at a singularly unattractive moment will say "no."

A machine's capacity for distortion is enhanced when one party to a conversation knows that a recording is being made and the other does not. The knowledgeable person says nothing that he does not want to have graven on tape. The third ear affects his behavior as surely as knowledge of a camera's eye affects the pose of a witting subject. The behavior of one participant influences the response of the other in a conversation. (*See* Williamson v. United States, *supra*, 405 U.S. at 1027, 92 S.Ct. 1323, 31 L.Ed.2d 487 (Douglas, J., dissenting from denial of certiorari).) When we evaluate the reliability of the electronic harvest of participant monitoring, we must not overlook the fact that the invisible machine can produce a very different conversation from the one that would have occurred if neither person had a recorder.

The supervening difficulty with the reliability rationale, however, is that it is a response to an irrelevant question. Contraband discovered in the course of an illegal entry by police is inadmissible although it is the best evidence that contraband was present. We exclude the evidence, not because it is unreliable, but because the values preserved by the Fourth Amendment are of greater societal moment than the use of that evidence to obtain a criminal conviction.

The second reason, and the one most often forwarded, is that unfettered governmental electronic surveillance is necessary to protect us from crime. Of course, the government has a great and legitimate interest in detecting and preventing crime, but that interest must be balanced against the individual's right to be free from unjustified intrusions. The balance was struck by the draftsmen of the Fourth Amendment: the governmental interest in combating crime is fully accommodated by permitting all searches and seizures, subject only to advance authorization by a magistrate upon a showing of probable cause; and the individual's expectations of privacy are protected by the knowledge that warrantless intrusions into his life will not be tolerated.

The third reason is rarely articulated, but hostility to the exclusionary rule permeates opinion after opinion, commencing with *Olmstead.* Dissatisfaction with the exclusionary rule as the predominate remedy for conduct violating the Fourth Amendment is understandable and defensible. Attacks on the constitutional right of privacy as the means of expressing dissatisfaction with the remedy are intellectually indefensible and dangerous. A constitutional right continuously diluted becomes no right. Destroying a right protected by the Fourth Amendment because of distaste for the remedy makes little more sense than destroying a patient for failure to respond to chosen medication. If the remedy is wrong, it is time to reexamine the remedy, not to diminish the right.

The threat to fundamental constitutional values and to the quality of life in our country which is created by the ruling of the majority can be revealed by even brief reflection upon the directions

in which an insensitive embrace of electronic hardware will carry us. The fact that the issues have arisen in the context of a criminal case should not obscure the reality that the basic right at stake is the right of all of us to be free from unjustified governmental encroachments upon our privacy. This is the right that Mr. Justice Brandeis accurately described as "the most comprehensive of rights and the right most valued by civilized men." (Olmstead v. United States, *supra,* 277 U.S. at 478, 48 S.Ct. at 572.) It is a right secured not alone by the Fourth Amendment, but by the entire Bill of Rights. (*E. g.,* Roe v. Wade (1973) 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147; Griswold v. Connecticut (1965) 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510.)

If the right protected by the Fourth Amendment is shriveled, how can the First Amendment revitalize it? If Holmes' conversation can be legally intercepted and electronically recorded because he was suspected of wrongdoing by law enforcement officers exercising their unreviewed discretion, where is the constitutional rock upon which rests anyone's right to be free from overzealous governmental probing?

Do we want to live in a society in which all of us must anticipate that we are always subject to electronic monitoring? Must we be ever watchful because our clients, friends, and acquaintances may be recording all we say for relay to a suspicious government? Do we want to convert our courtrooms into arenas in which we pit men against machines, or in which a person's liberty is decided in a contest fought by electronic surrogates because machines are more "reliable" than human beings?

The chilling atmosphere that these questions evoke is neither fanciful nor remote. In a nation wracked by fear of crime and engulfed by Orwellian devices, that dehumanized world can become our own unless we build constitutional walls that can be breached neither by the boldest leader nor by legions of the timorous. The draftsmen of the Bill of Rights laid the foundation for those walls. Justices Bradley and Brandeis built upon them. Sturdy materials to construct the edifice are available in the decisions of the Supreme Court recognizing a constitutional right of privacy emanating from the whole Bill of Rights.

Express recognition that the same constitutional right to be free from unjustifiable governmental penetrations of personality inheres in all persons, whether or not suspected of crime, would be a major step in constructing an effective barrier against untoward governmental interference with privacy. Yet this substantial protection of the basic right of privacy can be accomplished without any significant impairment of legitimate governmental interests.[31] No one challenges the right of the government to employ modern technology in criminal law enforcement. The only issue is whether to interpose the Fourth Amendment warrant procedure between law enforcement agencies and the ordinary citizen. The warrant requirement will not end electronic surveillance. It would reassure us that "this capability will not be used to intrude upon cherished privacy of law-abiding citizens."

31. In the event that in some instances governmental interests do collide with a person's constitutionally secured right of privacy, the conflict would be adjudicated by sensitive utilization of the balancing tests developed in cases arising under the First and Fourteenth Amendments. *E.g.,* In re Stolar (1971) 401 U.S. 23, 91 S.Ct. 713, 27 L.Ed.2d 657; United States v. O'Brien (1968) 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672; DeGregory v. Attorney General (1966) 383 U.S. 825, 86 S.Ct. 1148, 16 L.Ed.2d 292; Shelton v. Tucker, *supra,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231. *See also* Bursey v. United States (9th Cir. 1972) 466 F.2d 1059. The same technique could be applied in the context of either criminal or civil litigation. (*See* 42 U.S.C. § 1983 (civil remedy for vindication of constitutional right to privacy violated by state action); Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics (1971) 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (civil remedy for action of federal agents).)

(United States v. United States District Court, *supra*, 407 U.S. at 312, 92 S.Ct. at 2134. Footnote omitted.)

I would overturn United States v. Puchi (9th Cir. 1971) 441 F.2d 697, as contrary to *Katz*, and reverse the order denying Holmes' habeas petition.